Uhlig v. Garrison et al.

2  71
2  99
2  347
2  462
3  201
6  521
2* 253
2* 258
11* 104
14* 430
47* 396

## UHLIG v. GARRISON ET AL.

1. SIOUX TREATY OF 1868. By the treaty of 1868, proclaimed by the President, February 24, 1869, with the Sioux Indians, the district of country known as the Black Hills, became an Indian reservation.

2. SAME. The agreement passed by Congress, approved February 28, 1877, expressly admits that a reservation was defined by Article 2 of said treaty, and modifies the same,—abrogates Article 16 of the treaty, and relinquishes and cedes the Black Hills country to the United States.

3. AGREEMENT OF 1877. By Article 8 of the said agreement, the provisions of the treaty of 1866, except as modified, continued in full force; and, with the provisions of the agreement, apply to any country which may thereafter be occupied by those Indians as a home.

4. LOCUS IN QUO: INDIAN COUNTRY. The *locus in quo* was Indian country, to which the Indian title was not relinquished until by force of the agreement of February 28, 1877.

5. CONTRACT: UNLAWFUL. A contract is unlawful which is contrary to an express provision of law; or contrary to the policy of express law, though not expressly prohibited; or otherwise contrary to good morals.

6. LEASE: ESTOPPLE. In an action upon a contract of lease which is unlawful and void, a lessee is not estopped to deny his landlord's title.

7. LEASE: LAND IN INDIAN COUNTRY OR RESERVATION: PLACE OF PERFORMANCE. Where the land in dispute lies and the contract of lease is to be performed in the said Indian country or reservation, the relation of landlord and tenant cannot legally exist.

8. ACTION ON ILLEGAL CONTRACT. Where an action rests altogether upon an illegal contract the action must fail.

9. SECTION 2319, REVISED STATUTES OF THE UNITED STATES. The decision of the Court in this case has no bearing upon the provisions of section 2319 of the United States Revised Statutes.*

*Appeal from the District Court of Lawrence County.*

THE facts are stated in the opinion.

*Tripp & Boyles,* for appellants.

This is an action of ejectment brought by plaintiff to recover possession of a part of a certain lot in the city of Deadwood. The case was tried by a jury, and a verdict rendered, upon which the Court entered judgment for plaintiff, from which judgment entered on the 9th day of November, 1877, the defendants appeal to the Supreme Court and claim that the judgment so entered should be reversed because the court below erred.

I. In instructing the jury that the actual possession of a part of a well defined lot or parcel of ground, with claim to the whole and the exercise of acts of ownership over the remainder, is in law a possession of the entire lot or tract.

This the defendants contend is not the law, except in cases where the possession is held in good faith under a deed or color of title. That is not the case here. The land in controversy was government land, and the Court so charged the jury.

Plaintiff's right to recover rests upon prior possession alone, and his right to recover resting in possession only, that possession must be an *actual* possession, a *constructive* possession is not sufficient. (*Pollock v. McGrath,* 32 Cal., 15; *Garrison v. Sampson,* 15 Cal., 93; *Coryell v. Cain,* 16 Cal., 567; *DeGraw v. Taylor,* 37 Mo., 310; *Fugate v. Pierce,* 49 Mo., 441–8; *Long v. Higgenbotham,* 56 Mo.,

---

*.Cases referred to: Lessee of Pollard's Heirs, 14 Peters, 388, 389, "it would be a bold proposition that an Act of Congress must be first passed in order to give it" (a treaty) "effect as such," etc.; also id., 412, 415; Worcester v. Georgia, 6 Peters, 561, 681; Kansas Indians, 5 Wall., 737; Bates v. Clark, 5 Otto, 220; Martin v. Wade, 37 Cal., 175; The Pioneer, Deady's R., 79; Harkness v. Underhill, 1 Black, 325.

Uhlig v. Garrison et al.

245–51; *Walsh v. Hill*, 38 Cal., 481; *Kile v. Tubbs*, 23 Cal., 431; *Sunol et al v. Hepburn et al*, 1 Cal., 255; *Thompson v. Burnham*, 61 N. Y., 68; 3 Wash. Real Prop., 118, § 9; *Cannon v. Union L. Co.*, 38 Cal, 672; *Murphy v. Wallingford*, 6 Cal., 648; *Jackson v. Warford*, 7 Wend., 62.)

There can be no such thing as constructive possession when the foundation of plaintiff's claim is a naked prior possession, without entry under color of title.

And where the ownership of land is in the government, a party knowing such fact *and entering under a deed* can obtain no constructive possession to any of the land. (See *supra*, *Cannon v. Union L. Co.*, 38 Cal., 672.)

Again, the Judge's charge was to the effect that if the defendants held any portion of the lot in controversy as the tenants of plaintiff, they thereby held the whole of such lot as his tenants, and cannot in this action be heard to deny his title. In other words, that the defendants, while holding possession of a portion of the lot under a lease from plaintiff, could not initiate any possession to the remainder of the lot hostile to plaintiff.

That naked possession of a portion of a lot or tract of land, without color of title, is not a constructive possession of the remainder, is clear from the decisions; and *a fortiori* a tenant who enters under a lease for a well defined portion of a lot is not in constructive possession of the portion outside of his lease.

Constructive possession is upheld only in those cases where the party enters under color of title to the whole premises; and the constructive possession is then held to extend to the *boundaries* of the grant only. The landlord in this case can, by reason of his tenant's occupancy, get no greater constructive possession than his tenants have, and the tenants have no greater constructive possession than the boundaries of their lease. It will hardly be contended that if these tenants had been ousted by an intruder, they could have recovered a greater possession than is included by the boundaries of their lease. (*Walsh v. Hill*, 38 Cal., 481.)

II. For the same reasons, the Court erred in allowing the lease from plaintiff to assignors of defendants to be read in evidence for the purpose of showing "claim and exercise of ownership by plain-

tiff" over lands different from those described in the complaint. Such testimony was clearly irrelevant, and under the instruction of the Court, clearly incompetent. Plaintiff's theory of the case, and which was sustained by the rulings of the Court, seems to have been that acts of ownership by the plaintiff over a part of the lot were acts of ownership over the whole lot, and that by giving a lease to a portion of the lot, the plaintiff was showing a claim and exercise of ownership over the whole lot. This was clearly error. The issue was a prior possession, not ownership. The ownership was in the government. The Court so instructed the jury. To introduce the lease to show acts of ownership was incompetent, but once admitted it tended to prove that the relation of landlord and tenant once existed as to a part of this lot, which relation of landlord and tenant being proved to exist as to a part of the lot, was by the jury construed, under the charge of the Court, to extend to the whole lot.

2. The lease was incompetent to show any claim and exercise of ownership over the premises, for the reason that the premises were then a part of the great Sioux Indian reservation, and no white person, except those enumerated in the treaty, were permitted thereon, much less to lease and occupy the same. Such lease, as appears from its face, was of no binding force or validity. It was a contract in violation of law and the treaty of the United States. (Revised Statutes, § 2118; Treaty, April 29, 1868; 15 U. S. Statutes, 635; 16 Wall., 443.) And such lease being made in violation of law was of no validity, and therefore irrelevant. (*Tyler v. Green,* 28 Cal., 407–9; *Page v. Hobbs,* 27 Cal., 484–8–9.)

But it is urged that these defendants were tenants and are estopped from setting up this defense as against their landlord. To which defendants reply, the doctrine of estoppel does not apply here:

1st. Because the evidence showing want of title in plaintiff appears in the case he makes. He shows his own want of title. The principle admits of no discussion, that in ejectment the plaintiff recovers upon the strength of his own title, not upon the weakness of the defendants; and in showing the strength of his own case he offers this lease as the foundation of his right to recover,

which upon its face discloses the illegality of the contract, in that it was made at a time when plaintiff had and could have no lawful right to make the same. Can it be said that defendants are estopped from discussing the weakness of the case made by plaintiff himself? Estoppel can arise only where the party offers to prove some fact contrary to what he has before admitted, and upon which admission the other party has acted. He is not estopped when his adversary proves it for him. As the books say, "there is no estoppel when the truth appears." (Bigelow Estop., 293; *Wheelock v. Henshaw*, 19 Pick., 341–5, and cases cited; *Sinclair v. Jackson*, 8 Cow., 543, 586.) It was held in *Saunders v. Merryweather;* "that if an ejectment be brought upon a lease which shows upon its face that the lessor has no legal reversion, there will be no estoppel on the tenant. (3 Hurl. & C., 902.) And to the same effect, *Pargeta v. Harris*, 7 Q. B., 708, cited by Bigelow Estop., 293.

2d. The defendants are not estopped to deny that the relation of landlord and tenant did not exist. And they may show that relation did not exist, by the plaintiff's testimony, or by affirmative proof on their own side. The tenant is always permitted to show that the landlord's title has ceased or become extinguished; that he has been ousted by title paramount; that he has acquired his landlord's title; that he was insane at the time of making the contract; that the contract was vitiated by fraud on the part of the lessor; that the contract was made through ignorance or a mistake on the part of the tenant; and any fact that goes to deny the existence of the tenancy. (Bigelow on Estoppel, 380–1, and cases cited; *Jackson v. Rowland*, 6 Wend., 666; *Glen v. Gibson*, 9 Barb., 638; *Gleim v. Rise*, 6 Watts, 44; *Reay v. Cotter*, 29 Cal., 168; *Hayne v. Maltby*, 3 Tenn. R., 441; Willard Real Est., 365; *Jackson v. Cuerden*, 2 Johns. Cas., 353; 7 Wend., 401; 1 Dill, 213; 1 Black, 316.)

The tendency of the modern decisons is to limit the doctrine of the tenant's estoppel, and not to allow it to be extended beyond the adjudicated cases; that "estoppels are odious;" and the old decisions are distinguished from each case under consideration by the Court. Two late cases in California lay down the doctrine that

"the bare possession by the tenant of the demised land at the time the lease is given, is sufficient to take the case out of the operation of the rule. (*Franklin v. Merida,* 35 Cal., 558; *Tewksbury v. Magraff,* 33 Cal., 237.)

The books are full of cases that a mistake of fact on the part of the lessee may be set up by him in denial of the alleged tenancy. And some of the cases have extended the doctrine to a mistake of law. (*Glen v. Gibson,* 9 Barb., 638; *Tewksbury v. Magraff,* 33 Cal., 245.) But the distinction drawn between mistakes of law and of fact, upon the ground that "ignorance of law excuses no one," is done away with by our Statute. (Civil Code, § 889.) And it can hardly be doubted that the lease in evidence was drawn and such contract entered into between plaintiff and the assignors of these defendants under a mistake of law, a mistake of plaintiff's legal right of occupation and to demise the premises. And if so, the defendants *were* at liberty to deny the landlord's title, and the instruction of the Court to the contrary was error.

But tenants are not estopped from showing the illegality of the contract creating the tenancy. The law will not allow that to be done indirectly which cannot be done directly. It will not allow a contract to become legal by estoppel which is declared illegal by positive Statute. (Taylor Land. and Ten., 517, § 707; Broom Leg. Max., 498 (664.)

Hence, while parties who contract with corporations are estopped from denying their due incorporation, they are not estopped from showing that the corporation is doing business in violation of law, although they themselves are *particeps criminis* and are asking to avoid their own contract. (*Ætna Ins. Co. v. Harvey,* 11 Wis., (394) 412; 3 Gray, 215, 500; *Re* Comstock, 3 Sawyer, 218, and cases cited.)

In Massachusetts, where a married woman, under disability of their Statute prohibiting her executing such instruments, had executed a judgment bond, ante-dating the same and signing her maiden name, intending to defraud, the Supreme Court of that State held she was still not estopped from showing she was in fact a married woman when she executed the bond. (*Lowell v. Day,* 2

Gray, 161; also *Keen v. Coleman*, 39 Pa. St.; 299. The same doctrine is applied to infants. (*Brown v. McCune*, 5 Sandf., 224.)

In an action to recover upon a contract of insurance to a port interdicted by United States laws, the Massachusets Supreme Court held the insurance company not estopped to set up the illegality of the contract. (*Russell v. DeGrand*, 15 Mass., 35.)

In *Steadman v. Duhamel*, the Court say: "There cannot be an estoppel to show the violation of a Statute, even to the prejudice of an innocent party." (1 C. B., 888, cited; 3 Saw., 299; *Harkness and Wife v. Underhill*, 1 Black, 316; *Vickory v. Pratt*, 7 Kas., 238; *Stone v. Young*, 4 Kas., 17; *Dupas v. Wassell*, 1 Dil., 213.

Says the Court in *Byrne v. Beeson*: "When it is admitted that he is the tenant of the plaintiff, he is estopped from denying the plaintiff's right. But he may deny the *existence* of such tenancy. He may deny the *making* or the *validity* of the contract by which such tenancy is alleged to have been created." (1 Doug. (Mich.) 179, 182.)

That is defendants' position here. They deny the *existence* of such tenancy. They deny the validity of the contract alleged to create such tenancy. They say that there never was, and could not be, any valid contract creating the relation of landlord and tenant, and that the lease introduced by plaintiff as a part of his case, instead of proving the relation alleged, does prove that the contract relied upon and referred to in the charge of the Court was illegal and void, and therefore the charge of the Court, that "tenant could not dispute the title of his landlord," without qualification, was misleading, and therefore error. But plaintiff says the treaty was invalid; it was no treaty; it was not ratified by Congress, and plaintiff's occupation and contract of lease was not invalid.

The treaty power of the government is separate and distinct from the legislative, and as the Supreme Court of the United States say, in *Lessuck v. Kilbe*, 14 Peters, 388, " it would be a bold proposition that an Act of Congress must first be passed to give it a (treaty) effect." (See also pp. 412, 415.)

It has always been the practice of the government, until recently, to treat with the Indians as foreign nations, and the Supreme Court

. has always recognized the binding force of such treaties. (*Worcester v. Georgia*, 6 Peters, 561, 581; Kansas Indians, 5 Wall., 737; *Lattimer v. Poteet*, 14 Peters, 5.

The Court hold, in *Worcester v. Georgia, supra,* that though the reservation was within the State of Georgia, yet a citizen of Georgia had no right to enter thereon. In reference to treaty stipulations and matters of that kind that belong to the political departments of the government, it is the settled rule of the courts to follow the action of the executive and other political branches of the government, whose more especial duty it is to determine such affairs. (*United States v. Holiday*, 3 Wall., 419; *United States v. Reynes*, 9 How., 154; *Foster & Elam v. Nielson*, 2 Peters, 253; *Garcia v. Lee*, 12 Peters, 511; *Luther v. Borden*, 7 How., 35; *State of Georgia v. Stanton*, 6 Wall., 50; *State of Mississippi v. Johns.*, 4 Wall., 475; 7 Wall., 330; 5 Wall., 737, 755, 761; *Pollard's Lessees v. Hagan*, 3 How., 228.)

The validity of the Sioux treaty has been and is recognized by the executive and the departments of war and interior. (Proclamation by President, February 24th, 1869; Report of Secretary of War, 1875–6, Vol. I, 21; Letter Secretary of Interior, Vol. II, 1115; Ex. Doc., 184, 176–7; Rep. Sec'y Int., Vol. 1, 393, 176–7.)

Congress also at various times has recognized the validity of the treaty, by yearly appropriations to carry out the terms of the treaty, and by express recognition. (19 U. S. Statutes at Large, 192; see proviso; 16 id.. 37, 40, 353, 566–70; 17 id., 182–4–6.)

May 1st, 1876, Congress appropriated money to pay commissioners appointed to treat with the Indians for the relinquishment of the Black Hills country. (19 U. S. Statutes at Large, 45; see also U. S. Revised Statutes, § 2079.) But if the treaty were invalid, still the plaintiff would have no right of possession in the premises, nor could he execute any valid lease of the same, for it would, irrespective of the treaty, be Indian country. The premises are upon lands that have never been ceded to the government by the Indians. (*Bates v. Clark*, 5 Otto, 220.)

The organization of the Territory of Dakota did not change the rights of the Indians to the premises. (Revised Statutes, § 1839; Organic Act.)

All the penalties and forfeitures applicable to the Indian country, enumerated in the Statutes of the United States, are applicable to these premises in controversy, although the treaty were invalid. The proclamation of the President alone was sufficient to withdraw or reserve these lands from settlement. (Proclamation of President, February 24, 1869; *Grisar v. McDowell*, 6 Wall., 381; *Wolcott v. DesMoines*, 5 Wall., 688; 4 Statutes at Large, 421; 5 id., 456.)

No one has any rights on the *ceded* lands of the government, until they have been thrown open for settlement, but all persons are prohibited from making settlement on such lands, and forfeit all improvements made thereon. (2 U. S. Statutes at Large, 445.) The extinguishment of the Indian title is not enough. There must be an express authority given before a settlement can be made upon the ceded lands, before they are thrown open for public settlement. (Danforth's *Lessees v. Thomas*, 1 Wheat., 155.)

If from any cause the land was not open to settlement, the plaintiff could get no right upon which he could maintain ejectment. (*Morton v. Nebraska*, 21 Wall., 660; *Reichart v. Phelps*, 6 Wall., 160; *Polk v. Wendell*, 9 Cranch, 99; *Minter v. Crommelin*, 18 How., 88.)

III.  The verdict is defective and will not sustain the judgment:

1st.  It is simply a conclusion of law.  It "finds for the plaintiff the legal title to the ground in controversy."  It is no determination of the issues.  The issue here was one of *prior possession, not of title*.  The Court expressly told the jury that "the lands in question are public lands of the United States."  And yet in the face of this instruction the jury found the legal title thereto in this plaintiff.  The Court, of its own motion, would have been justified in setting aside the verdict as contrary to law.

2d.  Another issue made by the pleadings was that of use and occupation, which was entirely ignored by the jury.  This was a proper and competent issue, as the law now stands, and one the defendant has the right to insist should have been passed upon by the jury; and such neglect or failure by the jury to pass upon a material issue is error, and a judgment founded on such verdict must be reversed. (*Holt v. Van Eps*, 1 Dak. Sup. Ct.; *Ross v. Austell*, 2 Cal., 183; 2 Wheat., 221; 11 Wheat., 415; 7 Wis., [211] 183.)

For these reasons the defendants claim that the judgment should be reversed and the case remanded.

*Gamble Bros.*, for respondent.

This is an action of ejectment, brought by the plaintiff to recover possession of a certain portion of a small town lot in the city of Deadwood, D. T. The action was commenced on the 11th day of May, 1877. The plaintiff alleges ownership and lawful possession of same on the 25th of April, 1877, and that the defendants unlawfully entered upon and ousted the plaintiff on that day. The plaintiff also, at the time of the commencement of the action, asked for and obtained a temporary injunction, on the ground of actual possession of the premises by himself and family; that defendants entered upon same by force, and were digging up the ground, blocking up the entrance to the house by means of excavations, etc.; also alleging threats of tearing down the house, and threats of violence, terrifying himself and family. The injunction was duly granted, and no counter-affidavits or opposition thereto appears of record. The defendants answer, and simply deny possession in plaintiff.

The case stood in the above condition until November 8, following, when the plaintiff amends his complaint by alleging demand. Defendants on same day file supplemental answer, alleging prior occupancy, and denying plaintiff's ownership and right of possession at the commencement of the action, and denying demand and damages. They allege by way of counter claim, that the land was vacant March 19th, 1877, and that they located the same under the laws of the United States. They allege valuable improvements in good faith, and ask judgment for value.

The plaintiff also, on November 8th, put in a reply, denying prior occupancy in defendants, alleging prior actual occupancy in himself, denying that the premises were vacant March 19th, and alleging actual occupancy on that day by him, and prior thereto, denying *bona fides* in defendants as to improvements, and alleging that while defendants were occupying a portion of the same lot, as tenants of plaintiff, they entered on the above premises, well knowing the plaintiff was the owner thereof.

I. Upon an examination of the bill of exceptions and the whole record in this case, it nowhere appears that the Indian question was never raised or mentioned in the court below. It cannot even be inferred from the pleadings, and no assignment of error appears in the case, raising that point, and the first time we hear of it in the record it is attempted to be raised in the appellant's brief in this court. That it is too late to raise that point for the first time in this court, no authority need be cited to prove. That proposition has been too long settled in the courts to need examination in respondent's brief. Besides, the Indian question is expressly left out in the bill of exceptions. The defendants do not plead title or possession at any time in a third person, in the Sioux Indians. They only allege ownership by reason of settlement nearly a month after the Indian title was extinguished.

When the lease was introduced in evidence before the jury, the defendants objected to its introduction, upon one ground only, viz: "Upon the ground of irrelevancy, because the ground or premises described in said lease was not the same as that named in the plaintiff's complaint."

The defendants have specified but one ground of objection—irrelevancy, because of *the reason* above stated. They state no other ground, and none other can be inferred from the language of the objection. No other ground of objection can be raised than what was stated below.

"An objection or exception must be accompanied with a statement of the ground upon which it is made, and it can be sustained on no other ground than thus specified." (*Durgin et al v. Ireland et al*, 14 N. Y., 322; *Newton v. Harris*, 6 N. Y., 345; *Elwell v. Dodge*, 33 Barb., 336; *People v. McCanly*, 45 Cal., 146; *Beard v. Dedolph*, 29 Wis., 136; *King v. Meyer*, 35 Cal., 646.

And in the case of *Durgin et al v. Ireland et al, supra*, page 328, the Court of Appeals of New York say: "It was essential for the defendants' counsel to raise the question before the Circuit Judge, whether an assignment, accompanied with an agreement such as was shown to exist in this case, was not illegal and void, if he would avail himself of it upon an appeal." And in the case of *King v. Meyer*, 35 Cal., 646, when King objected to the legality of

such contract, because in contravention of the pre-emption laws of
the United States—*held*, that it was unavailable, because not pre-
sented in the court below.

The question as to whether the lease is or is not illegal and void,
is not, therefore, before this court, and cannot be considered here.
And we can find no authority or precedent in any of the books
which permits appellants to raise it for the first time in the appel-
late court.

The consideration of the question as to whether the ground prior
to February 29th, 1877, was in the Indian country, and a part of
the great Sioux Indian reservation is totally foreign to this case,
and all the authorities and Statutes cited, and argument in appel-
lants' brief on that point are totally irrelevant to the case at bar.

II.    The next question to be considered in this case, and which
completely dispose of this appeal is, is the charge of the Judge to
the jury, properly before this court for review.

There is no error in the Judge's charge to the jury.    But this
court will not examine the charge to decide whether there is error,
because the errors therein, if any, are not properly brought before
this court for review.    The charge contains several distinct propo-
sitions of law, some of which are unquestionably good, and are not
complained of here.    There is nothing but a general exception to
the whole charge in the record, in the following words:    "To all
and every one of which instructions aforesaid, the defendants then
and there excepted."

A general exception to a whole charge will not be sustained, if
any portion of it is correct.    (*Lincoln v. Chaflin*, 7 Wall., U. S., 132;
*Hicks v. Coleman*, 25 Cal., 123; 3 Estee, 503, and cases cited; 2
Tillinghast & Shearman's Practice, 503, and cases cited; *Jones v.
Osgood*, 6 N. Y., 233; *Caldwell v. Murphy*, 11 N. Y., 416; *Chamber-
lain v. Pratt*, 33 N. Y., 47; *Newell v. Doty*, 33 N. Y., 89; *Magee v.
Badger*, 34 N. Y., 247; *Shrader v. White*, 2 Neb., 348; *Mil. & Ch.
R. R. Co. v. Hunter*, 11 Wis., 167; *Strachan v. Muxlow*, 31 Wis., 207,
and cases cited; *Morse v. Gillman*, 18 Wis., at 404; *Baldwin v.
Blanchard*, 15 Minn., 489; *State v. Stanley*, 14 Minn., 105; *Sumner
v. Blair*, 9 Kan., 521; *Lorieux v. Keller*, 5 Iowa, 196; *Schoner v.
Lynch*, 11 Iowa, 461.)

Uhlig v. Garrison et al.

And in the case of *Caldwell v. Murphy*, the Court of Appeals say : "The exception is at the end, and is 'to each and every part' of the charge. This has so often been held insufficient that no further remark respecting it is necessary.'" And in *Jones v. Osgood*, the Court say, that "the rules upon this subject are tending rather to increased strictness, and not at all to relaxation. They have their foundation in a just regard to the fair administration of justice." And in *Newell v. Doty*, the Court say : "The exceptions filed after the report, stating in general terms that 'the plaintiff excepts to each and every one of the decisions ; and rulings of the referee against the plaintiff on the trial of this action, severally, separately and distinctly,' amounts to nothing, and cannot be reviewed.'"

From the above authorities, and numerous others which could be cited, it follows beyond a question, that the charge of the Judge is not before this court for review. But nevertheless, appellant's counsel seek to parcel out portions of the charge, made on their motion, and complain of it as error. This, under no pretense, can they be permitted to do under the authorities.

III. An examination of the premises described in the lease, and the reservation made by the plaintiff therein, together with an examination of the premises described in this action, will at once show the relevancy of the lease in evidence for the purpose it was admitted by the Judge. The lease covers the whole half lot. This action is brought because of the forcible taking by the defendants of the part reserved by the lease in the same half lot while they were tenants of plaintiff. This was not showing constructive possession, but tended to prove actual possession and control by plaintiff of the premises described in this action as between these parties.

The possession of premises by a tenant is actual possession in the landlord, not constructive, (*Page v. Hobbs*, 27 Cal., 486,) and the decisions as to constructive possession have no application here. And it is well settled that the possession of the tenant is the possession of the landlord, as charged by the Judge. (*Vandayne v. Hepner*, 45 Ind., 589 ; *Mecham v. McKay*, 37 Cal., 154.)

If we examine the whole charge we will find it is exceedingly favorable to the defendants. The Judge fairly charged the jury

on the law of possession as between landlord and tenant, and it is to be presumed that there was evidence on that subject before the jury to which such charge applies, and the defendants cannot be heard to say there was not such evidence, unless they called the attention of the Court to that point below, and then brought the evidence up properly for review here. (3 Estee, 613; *Varnum v. Taylor,* 10 Bosw., 148.)

And in the above connection the Judge gave the following: "The actual possession of a portion of a well defined lot or parcel of ground, with claim to the whole, and exercise of acts of ownership over the remainder, is in law a possession of the entire lot or tract, provided it does not exceed in quantity the amount he is legally entitled to hold." This instruction, viewed in the light of the whole charge, together with the fact that this action is to recover a part reserved out of the lease of one half of a small town lot, was perfectly correct. It did not raise the question of constructive possession, but of actual possession, as between these parties. (*Plum v. Seward et al,* 4 Cal., 94.)

IV. The doctrine stated by appellants that in ejectment the plaintiff recovers on the strength of his own title, and not on the weakness of the defendant's, is not the law in this Territory, and has no application to the case at bar. It never was the law as between landlord and tenant. (See brief in other case, §§ 3 and 4, Part I. and Part IV., and authorities cited.)

The above principle, insisted upon by appellants, is changed, so that proof of prior possession and occupancy is sufficient to recover in ejectment against the defendants, notwithstanding the real title is in a third party, whether that third party be an individual, a corporation, or in the government of the United States. (Civil Code, § 581; Civil Code (Cal.) § 1006, and note with cases cited; Tyler on Ejectment, 72; *Hubbard v. Barry,* 21 Cal., 321; *Gunn v. Bates,* 6 Cal., 263; *Potter v. Knowls,* 5 Cal., 87; *Nagle v. Macy,* 9 Cal., 426; *Hutchinson v. Perley,* 4 Cal., 33; *Christy v. Scott,* 14 How., 282; *Christy v. other parties,* 14 How., 296–7; *Burrnius v. Coffee,* 14 Cal., 91; *Shultz v. Arnop,* 33 Mo., 172; *Fugate v. Pierce,* 44 Mo., 444; *Wilson v. Palmer,* 18 Texas, 592; *Bird v. Lesbros,* 9 Cal., 1; *Shumway v. Phillips,* 22 Penn. St., 135; *Hopkins v. Mason,* 61 Barb., 469;

*Randall v. Falkner*, 41 Cal., 242; *Southmayd v. Henly*, 45 Cal., 535; 1 Phill. Evidence, 537; 2 Greenl. Ev., 287.)

And section 910, of the U. S. Revised Statutes, provides that no possessory action between persons for the recovery of any mining claim, shall be affected by the fact that the paramount title to the land is in the United States. (*Millett v. U. S., G. & S. M: Co.*, 1 Nev., 200; *Robertson v. Smith*, 1 Mont., 410.)

Chapter 8, page 438, of the Revised Statutes, provides for town sites on public lands. Towns and town sites must of necessity follow mines and mining. Immense interests grow up on public lands in mining districts, the paramount title still remaining in the United States. And if prior peaceable possession was not sufficient to maintain ejectment, the most disastrous consequences would follow. (*Hubbard v. Barry, supra; Coryell v. Caine*, 16 Cal., 567; *Moore v. Tice*, 22 Cal., 515; *Dyson v. Bradshaw*, 23 Cal., 536.)

Although the errors and reasons assigned in Part II of appellant's brief as to the invalidity of the lease, and the cases in which tenants may dispute their landlord's title, are not before this court for review, none of them having been even remotely raised in the record in this ejectment case, by the pleadings or otherwise, still appellant's counsel cannot bring defendants under any of the rules laid down in that part of the brief.

The defendants are in no position here to say that they can take advantage of the weakness of plaintiff's case. The issue as to which had the stronger title, to-wit, by prior *bona fide* occupancy, was found against them. They allege various cases in which tenants are not estopped from denying landlord's title, etc., but do not bring themselves within any of the grounds. The defendants admit that the relation of landlord and tenant existed. The doctrine that a tenant is permitted to show that the landlord's title has ceased, has no application to either case between these parties. That rule applies sometimes in cases where the landlord's estate determines, such as an estate for years or for life, etc., and those estates have come to an end, and the tenant takes title from the reversioner or the like. But this plaintiff's title was possessory and is never determined unless he abandons it, or is ousted by the owner of the paramount title. But he is never ousted until the

owner of the paramount title moves and evicts him or his tenant. (*Millett v. U. S., G. & S. M. Co.*, 1 Nev., 201.)

The tenant cannot get even the fee simple title !rom the paramount owner and defeat his original landlord in an action of ejectment until he first surrenders possession. (See cases cited in other brief, § 2, par. 4.)

It certainly will not seriously be contended that the defendants in either case are in a position to plead or say they have acquired their landlord's titie. If plaintiff, owning the possessory title to the land, lease it to the defendants, they certainly cannot by any subterfuge, be permitted to say that they have acquired his title, without plaintiff's consent or abandonment. No one is alleged to be insane, no fraud is charged upon the plaintiff, no ignorance or mistake of fact or of law is claimed on the part of any one; hence the consideration of these points is foreign to both cases. (*Camarillo v. Fenlon*, 49 Cal., 203.)

Appellant's counsel further seek to parcel out a paragraph of the Judge's charge and call it error, and assert that the Court charged that "a tenant could not dispute the title of his landlord" without qualification. The Judge did not so charge without qualification. But if he had done so it would have been absolutely correct. The defendants in the record of either case fail to bring themselves within any rule, permitting them to dispute their landlord's title, if the jury found they were tenants. (Tyler on Ejectment, 166; see cases cited in other brief, § 1, par. 2.)

V. Although respondents' counsel insists that the consideration of the Indian question is not before this court, still if the court should hold the premises to be within an Indian reservation prior to February 28th, 1877, that conclusion would not affect the rights of the parties to this suit, or render the lease incompetent or irrelevant as evidence. (Taylor's Landlord, §§ 19 and 80.)

1. And when the Indian title was extinguished, and all treaty inhibitions as to the Black Hills were abolished, the real and existing rights and contracts therein became operative *eo instanti*, and no one was in a condition to take advantage of the previous existing illegality of contracts, if they were illegal. The settlement of the Hills, the opening of the mines of gold, the building of cities,

and developing of the resources of that country were not immoral, and leases or contracts in reference to property were not corrupt. The situation of the parties would therefore be the same as though no previous inhibitions existed. The courts would lend no aid to either party to a contract made about real property in the Hills, while the inhibition existed; but when all inhibitions and penalties were removed, the party seeking to avoid previous contracts would have no prohibitory statute to appeal to, because it was swept away as to the Hills, and he would be in the same condition as a party to-day would be if he plead the old usury law of 1865, and sought to avoid his contract thereunder. The Court would say to him, you did not invoke that law when it was in force, and although the contract was void then under the Statute, the law rendering it void is repealed, and your remedy to avoid your contract is gone.

2. Another serious objection to the defendant's raising the Indian question in this case is, that the Indian intercourse law of June 30th, 1834, and the Revised Statutes on that subject are purely local Statutes. They have no applications beyond the locality covered by the express operation of the act. (*United States v. Seveloff*, 2 Sawyer, 312.)

The Black Hills were, subsequent to February 28th, 1877, taken out of the locality covered by that act, and none of the Indian intercourse laws could reach over it afterwards. If a defendant sets up an outstanding title in a stranger, it must be a present subsisting title. The defendants do not connect themselves with any original possession of the Indians, and hence the question of their original possession or rights, which were entirely extinguished, is not before this court. (*Johnson v. Klock*, 3 John, 374.)

3. The premises in question were never within an Indian reservation. There never was a Great Sioux Indian reservation until February 28th, 1877, when the agreement creating it was ratified by Act of Congress on that day. Previous to that date, no such reservation was set apart as provided by existing laws. The Court, in arriving at a conclusion as to whether the above position is correct, are called upon to decide a question as to treaties with Indians, never before presented to an Appellate Court. The ques-

tion is a new one, both as to circumstances and as to law, and the Court, in determining the question, should keep in view the following facts, in the consideration of which, the authorities furnish no precedent:

As a matter of history, the Black Hills were settled with thousands of our best citizens, and immense interests had peaceably been acquired both to mining and to city property, prior to the above date. That that country was practically abandoned by the Indians, the principal part of the Sioux never having resided therein, being at Red Cloud and Spotted Tail Agencies in Nebraska; that in the present decision, no Indian rights can be affected; that the treaty, if there was one, is a thing of the past; that no order or decision of any officer of the executive department can be affected thereby; that no conflict of opinion can possibly arise with any other department; that no rights previously existing, either as to person or property, civil or criminal, can possibly be prejudiced. And on the other hand, if the position contended for by appellant's counsel, and its legal results claimed by them follow, the most disastrous consequences would result; great interests would be ruined; titles would have no legal inception; cities would have no legal origin, and titles acquired would cease to be titles, and void. The results in numerous instances would be ruinous, unless the public sentiment in that country would hinder by force of local law and custom the results contended for by appellant's counsel.

Congress has power to *dispose of* and make all needful rules and regulations respecting the *territory* belonging to the United States. (Article 4, U. S. Constitution.) This means Congress, not the Senate and President.

As long as the government pursued the policy of making treaties with Indian tribes, and of setting apart reservations to them by treaty, and Congress acquiesced in that policy, it is clear that the courts did not and would not question the treaties, and such are the decisions. But as soon as Congress, by express enactment, asserted its constitutional prerogative, a different question arises.

Certainly no one would seriously contend that a treaty, much less a reservation, attempted to be made in the face of section 2079

of the Revised Statutes, would have any validity which any court would respect. Congress by that section declares that no treaties shall be made. (Act of March 4th, 1871, U. S. Statutes at Large, 566.)

Congress enacts by this general law, that the public domain shall not be segregated or apportioned off to Indian tribes without the approval of Congress.

This inhibition by general statute upon the alleged treaty-making power in reference to Indian tribes is certainly constitutional, and is the law of the land, which no court would hesitate to follow. Now if this is a proper exercise of the Legislative power of the general government, it follows, if that power was ever exercised in a particular instance in reference to the constructing of any particular district or reservation, and Congress reserved to itself the right to approve of that district or reservation before it should become one, then any attempt to set apart a reservation without the assent of Congress would be inoperative and incomplete, and would be no reservation until such approval by Congress. Such is the case with the Great Sioux Indian Reservation. Congress by the Act of July 20th, 1867, 15 Statutes at Large, page 17, created a commission to select a district for various tribes, and provided in section 2, that such district when so selected, and the selection approved by Congress, should become the homes of the Indians, etc. The district was selected by the commissioners, but never approved by Congress until February 28th, 1877, after subsequent modification by a new commission. No reservation or district was lawfully set apart to those Indians until that date. (U. S. Statutes 44th Congress, 1876, p. 254.)

Congress in the Act of July 20th, 1867, did not expressly say that no treaty should be made with the Sioux Indians, but it did say that any reservation or district selected should be subject to their approval, and until that approval was had certainly no reservation was formed. It is no answer to the above position to say that the courts will follow the action of the executive and other political departments of the government in reference to this alleged treaty. Because no such case was ever presented to the Supreme Court in the cases cited by appellants. Congress has carefully

avoided in all subsequent acts to do anything to ratify that treaty. The appropriations were made to feed the Indians, and nowhere is there an Act tending to show that Congress ratified the treaty, but rather avoided it. The case of *Bates v. Clark*, 5 Otto, 220, is strangely silent as to that treaty. And if the acts of the executive department go for anything, their action during two years previous to February 28th, 1877, in permitting the Hills to be settled by thousands of citizens would negative their previous act recognizing the reservation as actually set apart.

The question, therefore, comes fairly before this court to determine, has Congress the sole power to control the *disposal* of the territory of the United States. If so, it has the right to control the parceling out of the public domain to Indians as reservations.

If the Black Hills were not in an Indian reservation they were nevertheless in the Indian country. The question next arises, what was the condition of parties on this unceded Indian land without the limits of any reservation? If it was a reservation then the settlement was unlawful, and the parties were not only trespassers, but subject to a penalty. (§ 2118, Revised Statutes.)

If it was simply Indian country not belonging to the Indians by treaty, that section clearly does not apply. And there is no law punishing settlement in Indian country outside of a treaty reservation, unless the person or persons have been first removed from the Indian country by the proper authority, and have thereafter returned and are found within the Indian country. (§§ 2147 and 2148, Revised Statutes.)

And instead of removing anyone from the Black Hills the government permitted that country to be settled by thousands, and cities, towns, wagon roads and stage lines to be established, and immense mining interests to be acquired without molestation. And the executive and military departments did more towards protecting than hindering the immigration thither, and sent their revenue officers among them to collect revenue, and its officers to enforce other laws, but none to deter settlement. The most that could be said of them is, that the population were trespassers, and it is well settled that in ejectment one trespasser cannot plead the trespass of his co-trespasser, and more especially a tenant cannot plead the trespass of his landlord, unless fraud or mistake is alleged

and proved. (See *Camarillo v. Fenlon, supra; Coryell v. Cain,* 16 Cal., 567; *Richardson v. McNulty,* 24 Cal., 388; *Mallett v. U. S., G. & S. M. Co.,* 1 Nev., 200; *Hubbard ·v. Barry,* 21 Cal., 321.; *Bird v. Lisbros,* 9 Cal., 1; *Turner v. Aldridge,* 1 McAllester, 229; 2 Greenleaf's Evidence, 287.)

But if possession had been abandoned by the Indians, as it virtually was, the simple right of occupancy possessed by them, attached itself to the fee, which was, and is, in the United States, without further grant. (*Johnson v. McIntosh,* 8 Wheat., 574; *United States v. Cook,* 19 Wall., 591.)

And the parties would not be trespassers if they were on mineral lands, either as against the Indians or the United States. The minerals and even timber do not belong to the Indians, and they cannot sell the same.

The appellants' points and cases in Part III, of their brief, might apply with some force, if this was an action for agricultural lands, but they have no application to mineral lands and town sites, and settlements accompanying the same. All lands belonging to the United States, *to which the Indian title has been, or may hereafter be, extinguished,* shall be subject to the right of pre-emption and homestead.· (§§ 2257 and 2289, Revised Statutes.)

All valuable mineral deposits to lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase. (§ 2319, Revised Statutes; see also § 901, Revised Statutes; *Robertson v. Smith,* 1 Montana, 410.)

Nothing is here said about Indian title being extinguished. Towns and town sites necessarily follow mineral lands, and the law provides that citizens may found cities or towns on the public lands of the United States, both surveyed and unsurveyed. (Chap. 8, pp. 438–9 and 10, Revised Statutes.)

No mention is made in the chapter of the extinguishment of the Indian title, as a pre-requisite to the founding of a town site. The omission of any mention of Indian titles in the mineral and town site lands, and the mention of same in agricultural lands must have some difference of application, and the history of the

mining interests in the territories goes to show the government so construed it. . It encourages exploration of all mineral lands, and a large part of the original exploration and settlement in mineral lands have been upon Indian country before the extinguishment of the Indian title. And the government took steps to extinguish that title without disturbing the miners. And in all our examination of authorities, we have failed to find that a miner has ever been prosecuted by the government for opening mines, or for settling on mineral lands in the Indian country. And we have failed to find any case in the books where a settler on mineral lands has sought to avoid a contract in reference thereto, because it was made prior to the extinguishment of the Indian title.

We think it is clear that the citizens of this country can go all over the public lands, not included in any reservation, and explore the same, and if mineral lands are discovered they can settle thereon. These defendants stand alone in their position, unsupported by precedents or authorities.

VI. The above considerations and the authorities we submit lead to the following conclusions:

1. The defendants cannot raise the Indian question here, not having properly raised it in the court below.

2. After the extinguishment of the Indian title in the Black Hills, and the taking of that region out of the Indian country, no one was thereafter in a position to set up the illegality of any of his contracts in reference to real property prior thereto. It was simply a disability, if anything, which the law removed.

3. The Black Hills never was in an Indian reservation, and. laws and penalties in reference to Indian reservations never had any force in that country; and that these defendants could not avoid the relation of landlord and tenant, and the estoppel created thereby, even if it had been a reservation.

4. The most that can be claimed is, that the Black Hills was Indian country, and persons there not having been once removed, were simple trespassers, violating no law of the land, and all being simple trespassers, no one could plead the trespass of the other.

5. The Black Hills being mineral lands, and the city of Deadwood being a mining city, the settlement there was not unlawful;

Uhlig v. Garrison et al.

and the lease, when introduced in evidence, was valid; and it was perfectly competent evidence; and the defendants were as much estopped from disputing their landlord's title, under that lease, as though the Indian title had been extinguished prior to its date.

VII. The last objection made in appellant's brief is, that the verdict is defective. ·This question was not raised in the court below. But the verdict is sufficient. The question to be tried by the jury was, *the title*, by reason of prior *bona fide* occupancy, (§ 581, Civil·Code,) not the fee simple title, as that was not before the jury. It is no more a conclusion of law, than a general verdict for the plaintiff would have been. A party may have a legal title to land, and own no part of the fee. The ordinary meaning of the word "title" is the actual right to the property in dispute. And this is the force of the verdict. ·(Tyler on Ejectment, Chap. 9, pp. 165, 579, 582; 2 Bouvier's Law Dictionary, 596.) A verdict simply finding prior possession would have been void, because prior possession might have been abandoned.

The defendants insist that because the jury found no damages against them, that the verdict is, therefore, defective. If anyone could complain, it is the plaintiff, not the defendants. Use and occupation was an issue, but not necessarily connected with the right of recovery. · If the jury found no damages for the plaintiff, it was equivalent to finding no damages for use and occupation, and as expressly passes upon that issue as though they had inserted "no damages" in the verdict.

SHANNON, C. J.—In his complaint, the plaintiff alleges mere possession, without any legal interest, and without showing any right of possession, but relies solely upon an alleged relation of landlord and tenant. He sets up a written contract, dated the 24th day of August, 1876, at Deadwood, by which he leased to the assignors of the defendants a part of a lot of ground in said city, for a term of eight months. The lease is made a part of the bill of exceptions, and shows a rent of twenty-five dollars per month, payable in advance, and an agreement that, at the expiration of the lease, the plaintiff should pay the actual value of improvements made upon the lot.

Further allegations in the complaint are, of the expiration of the term on the 25th day of April, 1877, of a holding over, and of a notice to quit and a refusal. The relief demanded is for the possession, and for damages for the unlawful withholding and costs.

The answer of the defendants, without disputing the execution of the written contract, denies any ownership in the plaintiff, and that he was ever, at anytime, lawfully possessed of the premises. It contains the further averment, that the lawful and exclusive possession of the premises, at the date of the contract, and when the plaintiff pretended to be possessed thereof, to-wit, on the 24th day of August, 1876, was, as against plaintiff, in the Sioux Indians, and not in the plaintiff. And moreover, that the premises, on the 24th day of August, 1876, were lands to which the Indian title had not been extinguished, and were within an Indian reservation, and so remained until the 28th day of February, 1877, when they became a portion of the public lands of the United States, and were open to lawful settlement and occupation, etc.

It appears by the bill of exceptions that after the closing of the testimony, the defendants, by their counsel, asked the Court to instruct the jury, among other things, as follows: "The jury are instructed, that prior to February 28th, 1877, no title could be acquired to the ground in controversy by plaintiff, nor could he make any lawful lease of the same; the jury are, therefore, instructed to find a verdict for defendants."

The District Court refused to give such instruction, and this is alleged as error.

This court in the case of *McCall v. The United States,* (at December term, 1876,) considered that Deadwood was a place in the Sioux Indian reservation, set apart under the treaty proclaimed February 24th, 1869; and that the said reservation was in the Indian country; and that Deadwood was then a place within the sole and exclusive jurisdiction of the United States.

In that case it was objected that the defendant should have been indicted and tried in the Territorial court; but the court said that "it is well settled that a trial for homicide committed in an Indian reserve, must be had on the federal side of a Territorial court, and is governed by United States statutes and the rules of the common law." (1 Dak. Rep., 334.)

It is evident from the language of the Court, that it was so considered at the time, although in the absence of any such elaborate discussion as has been displayed in the present case.

We shall, however, proceed to examine the question again. It is now conceded, from authentic survey, that Deadwood was, in August, 1876, within the limits prescribed by Article 2, of the aforesaid treaty with the Sioux Indians, to-wit, the treaty of 1868, proclaimed by the President on the 24th of February, 1869.

The tract of country described in Article 2, was *set apart for the absolute and undisturbed use and occupation of those Indians;* and the United States solemnly agreed that no persons, except those therein designated and authorized so·to do, and except such officers, agents, and employes of the government, as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, " shall ever be permitted to pass over, *settle upon,* or reside in the Territory" described in said article, etc.

By this treaty, therefore, that district of country became an Indian reservation, to all intents and purposes. The treaty has never been wholly abrogated. The executive departments of the government have continuously acted upon it. There was some contention in Congress concerning the selection of the lands reserved, and regarding the approval of Congress thereto; but on the 15th of August, 1876, an Act was approved, entitled "An act making appropriations for the current and contingent expenses of the Indian Department," etc., in which, in reference to the Sioux Indians, the above tract is termed "*the permanent reservation,* established by the treaty of eighteen hundred and sixty-eight, for said Indians."

The agreement, approved February 28th, 1877, expressly admits that a *reservation* was defined by Article 2, of said treaty, and modifies the same, abrogates Article· 16, of the treaty, relinquishes and cedes the Black Hills country; and contains certain changes and concessions; but by Article VIII, of the agreement, the provisions of the treaty of 1868, except as modified, shall continue in full force, and, with the provisions of the agreement, shall apply to any country which may hereafter be occupied by the said Indians as a home.

Whilst section 2079, of the Revised Statutes, declares that there-

after no Indian nation or tribe shall be recognized as an independent nation, yet it also declares that "no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe, prior to March 3d, 1871, shall be invalidated or impaired." If the treaty of 1868 was not lawfully made and ratified, why, it may be asked, did not Congress promptly so declare the fact? From year to year, appropriations of various kinds, and of vast amounts, have been made to carry out its provisions.

Acts of practical ratification have more force than mere words of discontent and protest accompanying them. Until abrogated, this treaty was at least binding upon the consciences of the judicial and executive departments of the government, as well as upon those of the people. The constitution and the laws of the United States made in pursuance thereof, and all treaties made under the authority of the United States, are declared to be the supreme law of the land. As long as treaty obligations exist, they must be faithfully kept and upheld. (See *Worcester v. The State of Georgia*, 6 Peters, 560, 581.)

Thus aside from the dissatisfaction noticed, the three departments of the government have so far concurrently acted in support of the treaty, and this court will hold that it was lawfully made and ratified, and was binding in all its parts, until we shall be corrected by a higher tribunal.

The contract in this case was made at Deadwood, and was to be performed there. But at its date, that place was, and had been, set apart for the absolute and undisturbed use and occupation of the Indians. As it was unlawful for the contracting parties to settle upon the lot in controversy in August, 1876, so it was unlawful for them to assume the relation of landlord and tenant in regard to it. The object of the contract was unlawful when the contract was made. The object was to induce the lessee to take possession of, and to occupy the town lot, and to erect a building for a store, and to get rent for the ground. This written contract having such unlawful object was, and is, entirely void.

When the United States solemnly agreed that such persons as made this writing should not be permitted to settle upon this lot as long as the treaty stipulations should exist, it amounted to a

prohibition.  The treaty was the supreme law to warn and deter them from such unlawful contract.

The object of the contract was, moreover, in violation of section 2118, of the Revised Statutes, which declares that "every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of one thousand dollars.  The President may, moreover, take such measures, and employ such military force as he may judge necessary, to remove any such person from the lands."

The contract was not only void, but the parties were, therefore, liable to a prosecution for the penalties.  But aside from the latter consideration, such a contract cannot be sustained either at law or in equity.  For as was said by Chief Justice Taney, in *Kennett v. Chambers*, (14 How., 50,) "as the sovereignty resides in the people, every citizen is a portion of it, and is himself personally bound by the laws which the representatives of the sovereignty may pass, *or the treaties* into which they may enter, within the scope of their delegated authority.  And when that authority has plighted its faith to another nation, that there shall be peace and friendship between the citizens of the two countries, every citizen of the United States is equally and personally pledged.  The compact is made by the department of the government upon which he himself has agreed to confer the power.  It is his own personal compact as a portion of the sovereignty in whose behalf it is made. And he can do no act, nor enter into any agreement to promote or encourage revolt or hostilities against the territories of a country with which our government *is pledged by treaty* to be at peace, without a breach of his duty as a citizen, and the breach of the faith pledged to a foreign nation.  And if he does so, *he cannot claim the aid of a court of justice to enforce it.*"

This admirable exposition of the law arose in a case affecting a treaty with Mexico; and the same principle must govern in our courts in regard to a treaty with an Indian nation.  The latter is as much the supreme law as the former.  If our government solemnly pledges its faith by treaty, with Indian tribes, it must ever

be held as sacred and binding as if it were plighted to civilized nations. To maintain treaties, especially with the weak, is the glory of a nation, because it redounds to its honor and prosperity. To break them is to violate all law, and all faith, and all honor. Carthage has come down to us, through the long line of the centuries, as a people characterized by "Punic faith."

A contract is unlawful which is contrary to an express provision of law, or contrary to the policy of express law, though not expressly prohibited, or otherwise contrary to good morals. (See *Armstrong v. Toles*, 11 Wheat., 272; *Kennett v. Chambers, supra.*) And the law will not aid either of two parties who are equally in the wrong.

This case very much resembles that of *Dupas v. Wassell*, (1 Dillon's C. C. R., 213,) in which it was held that the lease was void by reason of being in violation of the Act of Congress reserving the Hot Springs lands, and because the lease was against public policy, and the lessee was not estopped to deny his landlord's title.

From all the above considerations the following conclusions must be drawn:

1. That the place in which the land in dispute lies, being also the place of the contract and of its performance, was Indian country, to which the Indian title was not relinquished until by force of the agreement, approved February 28th, 1877.

2. That the *locus in quo* also became an Indian reservation by virtue of the aforesaid treaty, ratified by the Senate on the 16th of February, 1869, and proclaimed eight days afterwards by the President; and that it continued to be so reserved until the cessation of the title under the aforesaid agreement, approved in 1877.

3. That the relation of landlord and tenant, as to this lot of ground, could not, and did not, legally exist on the said 24th of August, 1876, or afterward, whilst the treaty was in force, or the land remained as Indian country.

4. That the said contract of lease, being at its date unlawful in its objects, and in violation of the treaty and of the Statute, and contrary to public policy, was, and is, entirely void.

Uhlig v. Garrison et al.

5. And that, as the plaintiff's present action altogether rests upon this alleged contract, the action must fail.

6. That consequently the District Court erred in refusing to charge the jury in accordance with the defendants' request, that the plaintiff could not make any lawful lease of the ground in controversy.

No question touching at all upon the provisions of section 2319, of the Revised Statutes of the United States, has been presented in this case, and, therefore, nothing in this opinion is to be construed as relating to such mineral lands.

The District Court having erred in refusing to charge the jury as stated, it follows that the judgment must be reversed, and the cause is remanded to the court below, with directions to dismiss, the action, and it is so

ORDERED.

All the Justices concurring.