JOEL B. MAYES, *as Principal Chief of the Cherokee Nation, etc.*, v. THE CHEROKEE STRIP LIVE STOCK ASSOCIATION *et al.*

**No. 9654.**

LEASE OF INDIAN LANDS — *made in violation of act of Congress, no action maintainable for rent.* A lease of lands in the Cherokee Outlet was made by the Cherokee Nation to the defendants in violation of section 2116 of the Revised Statutes of the United States. Possession was taken under the lease, and, the defendants failing to pay a part of the stipulated rent an action was brought in behalf of the Cherokee Nation to recover the same. *Held*, that as the lease was prohibited by law and illegal, no action can be maintained thereon. [Allen, J., dissenting.]

Error from Sumner District Court. Hon. James A. Ray, Judge. Opinion filed December 11, 1897. *Affirmed.*

*Thomas George* and *W. W. Schwinn*, for plaintiff in error.

*Chester I. Long, J. C. Pollock, J. A. Burnette* and *Haughey & McBride*, for defendants in error.

JOHNSTON, J. This action was brought by Joel B. Mayes, as Principal Chief of the Cherokee Nation and for its benefit, against the Cherokee Strip Live Stock Association and a number of persons alleged to be members of or connected with the Association. Subsequently, C. J. Harris became Principal Chief of the Cherokee Nation and the action was revived in his name. The action is upon a contract to lease a large

body of land, constituting what is called the Cherokee Strip or Outlet, which was entered into between the Cherokee Nation and the Association. Among other things, the petition alleges that the Cherokee Nation is and has been the absolute owner in fee simple of the Outlet, which is said to contain about six million acres; that, on May 15, 1883, an act was passed by the National Council of the Cherokee Nation, authorizing a lease of the lands to the Association in consideration of the yearly rental of $100,000; and that in pursuance of this authority a written contract was executed, leasing the lands in the Outlet to the Association for a period of five years at an annual rental of $100,000, payable in advance, in two equal semi-annual payments. The lease, which is set out at length in the petition, contained many provisions in regard to the manner in which the land should be used and the conditions upon which the lease might terminate. It is alleged that the possession of the Outlet was taken by the Association under this lease, that the land was used for grazing purposes, and that the rent therefor was paid until the end of the five-year period; that, in December, 1888, the National Council of the Cherokee Nation passed an act providing for the renewal of the lease for another period of five years, with all the conditions, obligations and restrictions provided in the first lease, except that the annual rental was increased to $200,-000; the renewal to be deemed effective as soon as the Association should file an acceptance of the specified conditions. It is alleged that the acceptance was made in due form. The Association entered upon the use of the lands under the second lease, and made semi-annual payments of $100,000 each therefor until June 30, 1890, when a payment of $100,000 was due for the period ending December 31, 1890; since which

time it has failed and refused to make any payments in accordance with the terms of the lease.

There was an averment that the Association occupied the land through the season of 1890 with a great many cattle, and derived large profits from the pasturage and use of the land. It was also alleged that the manner in which the Association was organized, and the way in which it had conducted its business and disposed of its property, tended to defeat a recovery. Many of the averments of the petition bore only upon the application for a receiver, which is of no present importance.

Demurrers were filed by the defendants, upon several grounds, the principal one being that the facts stated did not make out a cause of action in favor of the plaintiff and against the defendants. The court sustained the demurrers, and that ruling is here for review.

The contentions of the parties are mainly directed at the legality of the lease and the effect of illegality. One claim is that the Cherokee Nation had no title to the land in the Outlet, and therefore no right to execute the lease or recover for the use of the land. The lands were patented to the Cherokee Nation by the United States in 1838. While the lands in question are designated as an outlet, they are included in the same patent and substantially upon the same terms as the lands granted to the Cherokees for a permanent home. Their title was more than a mere occupancy determinable at the pleasure of the United States. It was more than the ordinary Indian title; and, in respect to it, it has been held that they "hold their land by title different from the Indian title — by occupancy. They derived it by grant from the United States. It is a base, qualified or determinable fee, without the right of reversion, but only a possibility

of reversion, in the United States." *United States v. Reese*, 5 Dill. 405. This, in effect, puts all the estate in the Cherokee Nation. The grant was made upon a condition that the granted land should revert to the United States if the Cherokee Nation became extinct or should abandon the same. As has been said, there is, therefore, only a possibility of reversion, and we think the Cherokee Nation should be regarded as in a certain sense the owners of the land, and in the absence of any congressional restriction would be entitled to the use and control of the same. They hold it, however, subject to the Federal law which Congress has enacted for their protection, and in furtherance of the governmental policy in dealing with Indians. Being within the territorial limits of the United States, they are subject to the Federal authority, and Congress may pass laws regulating their conduct as well as of the people with they may come in contact. A provision of an act of Congress applicable to the Indians prohibits such a lease as was made in this instance, and it is contended that as it is in violation of law no action can be maintained thereon nor any recovery for the benefits derived thereunder. Section 2116 of the Revised Statutes of the United States is as follows :

"No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly, or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any land by them held or claimed, is liable to a penalty of one thousand dollars. The agent of any State who may be present at any treaty held with Indians under the authority of the

United States, in the presence and with the approbation of the commissioner of the United States, appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty."

There was no treaty or consent of the United States to the lease, but it was made in violation of the foregoing provision. Instead of consenting, the officers of the United States denied the right to enter into a lease, and, in considering the effect of the statutory provision upon the lease in question, the Attorney General held that "whatever the right or title may be, each of these tribes or nations is precluded by the force and effect of the statute from either alienating or leasing any part of the reservation, or imparting any interest or claim in or to the same, without the consent of the Government of the United States. A lease of the land for grazing purposes is as clearly within the statute as a lease for any other or general purposes, and the duration of the term is immaterial. One who enters with cattle or other live stock upon an Indian reservation under a lease of that description made in violation of the statute, is an intruder and may be removed therefrom as such, notwithstanding his entry is with the consent of the tribe." 18 Ops. Attys. Gen. 235, 486. Acting upon the advice of the Attorney General that the lease was illegal, and declaring that the further occupancy of the land thereunder was prejudicial to the public interests, the President, on February 17, 1890, ordered the removal of all live stock from the leased lands. It is clear that the contract of lease between the plaintiff and defendant conflicted with the governmental policy and was a direct violation of a positive statute. It was, therefore, illegal, and the courts generally hold that no action

can be maintained on a contract forbidden by law. "The policy of the law is to leave the parties in all such cases without remedy against each other. The courts will not lend their aid to a party who founds his action upon an immoral or illegal act. If from a plaintiff's own statement, or otherwise, the cause of action appears to arise *ex turpi causa* or from the transgression of a positive law of the state, there the court says he has no right to be assisted." *Gerlach v. Skinner*, 34 Kan. 86; *Korman v. Henry*, 32 id. 49; *Hinnen v. Newman*, 35 id. 709; *Flersheim v. Carey*, 39 id. 178; *Yount v. Denning*, 52 id. 629; *Melchoir v. McCarty*, 31 Wis. 252; *Downing v. Ringer*, 7 Mo. 585; *Live Stock Ass'n v. Cass Land Co.*, 40 S. W. Rep. 107; *Gould v. Kendall*, 19 N. W. Rep. 483; *Macintosh v. Renton*, 2 Wash. T. 121, 3 Pac. Rep. 830; Wharton on Contracts, § 340; 9 Am. & Eng. Encyc. of Law, 909.

It is suggested that the defendants were tenants of the plaintiff and should not be permitted to deny the plaintiff's title nor to question the legality of the lease. As the lease was contrary to public policy and a transgression of an express law, the rule invoked cannot be applied. In *Dupas v. Wassell* (1 Dill. 213), it was held that a lease of land on which the Hot Springs were situated, being in violation of an act of Congress, was absolutely void, and that the ground rent for the use of the lands could not be recovered; and it was further held that the lessee was not estopped from setting up the illegality. See, also, *Uhlig v. Garrison*, 2 Dak. 71. The contract in this case is to be distinguished from one which is merely void from want of compliance with some form or which is lacking in other essentials. Here, it was prohibited by statute, and being unlawful, it does not fall within the class of contracts which are void because of the infancy of one of the parties or because of the Statute of Frauds. In cases like this, the

courts will not lend their aid to the parties either to recover damages under the illegal contract or the profits supposed to have been derived from the unlawful transaction by either party. The fact that the defendants co-operated in the transgression and are equally implicated with the plaintiff does not prevent them from setting up the defense of invalidity. There is no innocent party here in whose favor an exception can be made, as the prohibitory provision affected all alike. It is unlike the case of *Land Co. v. Thompson* (57 Kan. 792), where Thompson was not a party to the illegal contract and was permitted to recover under the pleadings upon a *quantum meruit* for services in connection with pasturage on some of these lands. The controversy arises here directly between the parties to the illegal contract, and the plaintiff seeks a recovery through and under that contract. The parties voluntarily entered into the contract, and they must be held to have had knowledge that in doing so they were violating the law. No exception can be made in favor of the Cherokee Nation. Their action was deliberately taken, as the lease was authorized by an act duly passed by the legislative bodies of the Nation, which was approved by the Principal Chief. The act provided specifically what the terms of the lease should be, and in pursuance of the act the lease was executed. The Cherokees are permitted to make valid contracts and to bring actions for the enforcement of the same. They are subject to the laws of the United States, and they, as well as the defendants, were affected by the prohibition of the act of Congress in violation of which the lease was made. The fact that the law was in part made for their protection will not relieve them from its obligations. While their protection may have been the principal purpose of the act, it was passed in furtherance of the policy

of the General Government in dealing with these and all other Indian tribes. The United States still held a reversionary interest in the land, and was interested in preventing intruders from going upon the land, and thus avoiding the difficulties and conflicts liable to result from such intrusion. If it were held that the Cherokees might enforce such a contract, or recover under the same, the congressional purpose would be thwarted and the policy of the law defeated. We think the parties were equally at fault, and that neither is entitled to a remedy against the other.

There is some claim that the plaintiff was entitled to recover as upon a *quantum valebal* for the benefits received by the defendants. It is unnecessary to consider whether recovery can be had for benefits received in such a case as this, because the petition is not drawn upon that theory and no such issue was presented to the trial court. The illegal contract is specifically set forth in the petition, and the plaintiff claimed a right of recovery for rent under it. The language of the petition, as well as that used in plaintiff's brief, leaves no doubt that he founded his cause of action on the lease, and not upon an implied contract for any benefits derived by the defendants from the use of the land.

As the lease was in contravention of statute and illegal, we conclude that no recovery can be had thereon, and hence the court ruled correctly in sustaining the demurrers.

Judgment affirmed.

Doster, C. J., concurring.

ALLEN, J. (dissenting). Briefly stated, my view of the law applicable to this case is as follows: The general policy of the Government is to protect Indians, not admitted to citizenship, against the craft of the whites, who have a more just appreciation of the

value of titles to land, and are much more shrewd in driving bargains than they. Section 2116 of the Revised Statutes of the United States, copied in the opinion, was never intended to accomplish the result reached in this case. While it prevents Indians from executing valid leases and conveyances of their lands, the restriction was intended to operate by depriving the Indians of power to divest themselves of their titles to, and interests in, real property without the consent of the United States. Persons negotiating treaties with them are made liable to a penalty, but none is imposed on the Indians. The maxims *ex turpi causa non oritur actio* and *in pari delicto potior est conditio defendentis* do not apply, because the Indians are not in equal wrong. They do not deal on equal terms, and are not violators of any penal statute. They occupy, rather, the relation to deeds and leases made by them that other persons legally incapable of contracting do to their contracts. The effect of the law is to deprive them of power to convey, not to punish them for attempting to do so.

Although the lease under consideration was terminable at any time at the pleasure of the Indians, and, although the Government of the United States had the undoubted right to compel the lessees to vacate the land notwithstanding the lease, it yet did not excuse the lessees from payment according to its terms for the use and occupancy of the land while they were permitted to remain in possession of it. It cannot be that Congress ever intended that an Indian, or a tribe of Indians, should be prohibited from recovering for the use and occupation of lands leased to white men after the lessees had enjoyed the benefits of the lease. Such a construction would be turning legislation intended as a shield for the weak and unsuspecting into a sword in the hands of their enemies. It seems to

me that these views more nearly accord with the decision in *Land Company v. Thompson* (57 Kan. 792) and *United States v. Hunter* (21 Fed. Rep. 615). I see no reason why the Indians may not recover the stipulated rental for the time their lands were actually occupied by the defendants.