JOHN KENNETT, EZEKIEL S. HAINES, EDEN B. REEDER, GEORGE GRAHAM, JR., JOHN MCCARTY, JOSHUA YORKE, AND ROBERT B. BOWLER, APPELLANTS, *v.* THOMAS J. CHAMBERS.

It belongs exclusively to the political department of the government to recognize or to refuse to recognize a new government in a foreign country, claiming to have displaced the old and established a new one.

Until the political department of the government acknowledged the independence of Texas, the Judiciary were bound to consider the old order of things as having continued.

While the government of the United States acknowledged its treaty of limits and of amity and friendship with Mexico as still subsisting and obligatory, no citizen of the United States could lawfully furnish supplies to Texas to enable it to carry on the war against Mexico.

A contract, made in Cincinnati, after Texas declared itself independent, but before its independence was acknowledged by the United States, whereby the complainants agreed to furnish, and did furnish money to a General in the Texan army, to enable him to raise and equip troops to be employed against Mexico, was illegal and void, and cannot be enforced in a court of the United States.

The circumstance that the Texan officer agreed, in consideration of these advances of money, to convey to them certain lands in Texas, of which he covenanted that he was then the owner, will not make the contract valid when it appears upon the face of it, and by the averments in the bill, that the object and intention of the complainants in advancing the money was to assist Texas in its military operations.

A contract made in the United States at that time for the purchase of land in Texas, would have been valid even if the money was afterwards used to support hostilities with Mexico. But in this case it was not an ordinary purchase, but the object of the complainants, as avowed in the contract and the bill, was to aid Texas in its war with Mexico.

The contract being absolutely void by the laws of the United States at the time it was made, the circumstance that it was valid in Texas, and that Texas has since become a member of the Union, does not entitle the complainants to enforce it in the courts of the United States.

No contract can be enforced in the courts of the United States, no matter where made or where to be executed, if it is in violation of the laws of the United States, or is in contravention of the public policy of the government or in conflict with subsisting treaties.

In this cause *Mr. Justice Catron* was absent, because of indisposition, during the hearing before the court, and took no part in the decision.

This was an appeal from the District Court of the United States for the District of Texas.

The facts in the case are stated in the opinion of the court.

There were several causes of demurrer filed in the court below, but it is necessary to notice only the following, because the decision in this court turned entirely upon them.

1. The said bill, if the facts therein were true, which is in no sort admitted, contains no matter or thing of equity upon which to ground any decree, or give the complainants any aid or relief.

2. The complainants' said bill shows no legal or valid agreement upon which to ask the aid or decree of the court; but, to the contrary, sets out and shows an agreement which was in violation of the neutrality of the United States towards the Republic of Mexico in her contest with Texas.

3. The complainants' said bill seeks the aid or assistance of the court to enforce the specific execution of an agreement made in the State of Kentucky, between citizens thereof and this defendant, in violation of the policy of the government of the United States in her intercourse with foreign governments.

The demurrer was sustained generally by the court below, and therefore all the points were open to argument in this court; but it is not necessary to notice any except those upon which the judgment of the court rested.

It was argued by *Mr. Snethen,* for the appellants, and there was also a brief filed upon that side by *Mr. L. Sherwood.* On the part of the appellee it was argued by *Mr. Volney E. Howard.*

*Mr. Snethen* contended that the neutrality and foreign policy of the United States towards Mexico were regulated entirely by law, which was found in the 6th section of the act of Congress

of the 20th of April, 1818, (3 Stat. at Large, 449.) There is an entire absence, in the contract, of all declaration or indication of the place or country where the proposed military expeditions were to be begun, or of the place whence they were to be carried on. It will not be denied that, to subject an offender to the pains and penalties of this section, it must be incontestably and directly shown and proved that the "military expedition or enterprise" which he may "begin or set on foot," or "provide or prepare the means for," was begun or set on foot "within the territory or jurisdiction of the United States," and was "to be carried on from thence" against a nation with whom they were at peace. So obvious a proposition hardly needs the weight of authority to support it. Now the contract proves no such offence. The defendant may have done, and intended to have carried on, all the acts which the complainants enabled him to do, within and from some other country than the United States. The place or country where the forbidden acts were done and whence they were to be carried on, cannot be inferred from the language of the contract with any degree of certainty, and the omission cannot be supplied by any known rule of construction.

The 6th section of the act of 1818, is a penal enactment and must be construed strictly, and the proof to sustain an offence against it must be direct and positive. The contract affords not only no such proof, but no proof at all, that the forbidden acts were done within the United States, and to be carried on from thence. No such offence, therefore, as that denounced by the act, when strictly construed, having been proved against the parties to the contract, the contract itself consequently was not, when made, in violation of the neutrality or foreign policy of this country towards Mexico and other nations, as established and defined by said section and act.

The same course of argument was pursued by *Mr. L. Sherwood* in his brief for the appellants.

1. Texas, at the time of this contract, was an independent government. And in making the contract the complainants did not violate the laws of the United States, enacted to preserve our neutrality with nations with whom we were at peace, nor did they violate our treaty of amity with Mexico. Hence, the contract was legal, under the laws of the United States.

The people of Texas, represented by delegates, met in general convention at Washington, in Texas, on the 2d day of March, 1836, and declared themselves a "Free and Independent Republic." And then and there set themselves at work to organize and establish a government. And on the 17th day of the same month, had fully organized a government by the name

of " The Republic of Texas," under a written Constitution. (Laws of Republic of Texas, vol. 1, page 1 to 25.)

Then a new nation was born. An independent nation, that maintained her independence and freedom among the nations of the earth, and was subsequently recognized by them as possessing all the sovereignty and attributes of other nations. As such Republic, she maintained her independence in fact and in name, until she became incorporated into the government of the United States, December 29, 1845.

The first question to be determined by this court is, whether Texas, at the time before stated, had the right to become, and whether she did become an independent government?

That she had the right so to become, will not be doubted by any man, nor by any court, who " hold these truths to be self evident, that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness. That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed. That whenever any form of government becomes destructive of these ends, it is the right of the people to alter or abolish it, and to institute a new government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness.'

Such right your honors will not doubt. It was happily incorporated in the first principles of the first truly written international law;—in America, the first law that is learned by the courts or by the bar—learned generally, ere professional studies are commenced, and imbibed almost with the first nourishment of the American child.

That Texas, at the time to which I have referred, became entirely severed from the Republic of Mexico, is fully shown by the reference I have made to the first volume of her laws. That she maintained her independence, and was never again subjected to the dominion of Mexico, is a fact, sustained by the history of her struggles, as well as by the history of our own government, and other governments in their negotiations with her.

Although our government had not officially recognized the independence of Texas, at the date of this contract, yet, shortly after that period, official correspondence and intercourse commenced between the United States and the Republic of Texas, and we find a treaty negotiated between the two governments, as early as April, 1838. 8 Stat. at Large, 510.

It is claimed that this contract is void, as being in violation of the laws of the United States, provided for the punishment

4 *

of persons who shall, within the territory or jurisdiction of the United States, " begin or set on foot, or provide or prepare, the means for any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or State, with whom the United States are at peace."

This is a penal statute, and must be construed strictly. And I respectfully insist, that, while it is the policy of the United States government, to preserve her neutrality between belligerent nations, there is nothing in this law to prevent one of her citizens entering into a contract with a citizen of another independent government for the purchase of land lying in that government, even though it be recited in the contract, that it is the intention of the person selling his lands to use the money he receives for them in raising and equipping volunteers to maintain and advance the independence of his country.

It does not appear, from the bill, that the contract was for the advancement of funds to raise and equip volunteers within the United States, or to carry on war from thence against Mexico. For aught that appears, the design of General Chambers was to raise his volunteers in Texas. And it might as well be presumed that they were to be raised in Europe, as in the United States.

Besides, Texas was an independent government. And the purpose of General Chambers, as declared, was, to maintain her independence; and not to make incursions from the United States, or even from Texas, into Mexico.

There is nothing in this statute inhibiting a citizen of the United States from volunteering in the service of another government to maintain her independence, already declared; and uphold her government, fully instituted; nor declaring it unlawful for a citizen of the United States to contribute means for such purposes.

Again, it is insisted by the defendant, that this contract is in violation of the treaty of amity, commerce and navigation between the United States of America and the United Mexican States, of April 5, 1832.

The 1st article of that treaty is in these words: " There shall be a firm, inviolable, and universal peace, and a true and sincere friendship between the United States of America and the United Mexican States, in all the extent of their possessions and territories, and between their people and citizens respectively, without distinction of persons or places."

In revolutions, there must be a time when an old government ends and a new one begins. And when a new one begins, it must embrace a certain portion of the earth of which it has possession. Now with regard to this provision of the Treaty, I

respectfully insist, that, by a revolution, a portion of what was before Mexico, ceased to be any part of the possessions or territory of Mexico, and became the possessions and territory of the new government; and that this provision in the treaty could no longer bind the United States to regard the revolted territory as any part of the Mexican territory.

In regard to the obligations of this Treaty, and its binding force upon the United States, in September, 1836, the question is not, whether the United States had recognized the independence of Texas; but whether Texas had, in fact, achieved her independence.

If Texas had not achieved her independence in 1836, when this contract was executed, then she had not achieved it at a subsequent period, when the United States government did officially recognize her independence. And if these citizens of Ohio, in September, 1836, violated this treaty of amity with Mexico, then the United States government violated the same treaty in March, 1837, by recognizing, and in April, 1838, by treating with the Republic of Texas. For when this contract was made, the revolted colony had already achieved her independence, established her government, and had never relinquished any part of her territory acquired by the revolution.

The question whether Texas had achieved her independence in September, 1836, was a historic and governmental fact — a fact not depending upon any question of recognition by other and different nations.

It is true that other governments might or might not, as they should choose, send to and receive from Texas diplomatic agents. But whether they did or not, could not alter the fact of Texan independence, so long as Mexico never repossessed herself of the revolting territory. And so far as the fact of Texan independence was concerned, it was no more the province of our government than of any other to determine when that fact transpired. And, as I conceive, no more the province of any government, than of the citizens, except so far as concerns the relations of diplomacy.

The recognition of the independence of Texas, by the United States, in no way determined the fact as to when she became independent, any more than did the acknowledgment of the independence of the United States by the British government, determine the fact as to when the United States became independent. If the time or date of the independence of revolting colonies depends on the decision of neutral nations, and not upon the fact whether the revolting colony has established a civil government which is continued in successful operation, performing all the functions of an independent power, then we are

all mistaken in the date of our national existence; and instead of celebrating the anniversary of the 4th of July, 1776, we should ascertain the different days of the recognition of our independence by other nations, and celebrate them. And thus, instead of having one national holiday, we would have as many as there are nations with whom we have diplomatic relations. By such a decision our boys would be delighted, and the interests of pyrotechnists greatly benefited.

*Mr. Volney E. Howard,* for the appellees.

We insist that the bill in this case cannot be maintained, because, —

1. It is shown, on the face of the contract and the bill, that the obligation was given to enable General Chambers to raise and equip volunteers, to carry on a war in Texas against the republic of Mexico, and was therefore in violation of our neutrality laws with Mexico. The contract was entered into in Ohio, in September, 1836, before this government had acknowledged the independence of Texas. Contracts to furnish money to carry on war by revolted subjects, against a government with whom we are at peace, are void. 1 Kent, 116, 118, 123; Dewentz *v.* Hendricks, 9 Moore, C. B. 586. If the government does not interfere, it is illegal for citizens to do so. 1 Kent, 24, note A, 25, note. And, until the government acknowledges the independence of the revolted province, the courts recognize the ancient condition of things, under which this contract would be illegal. 1 Kent, 25; 9 Ves. 347; 4 Cranch, 272; 13 J. R. 561, 587; 3 Wheat. 324, 610; Wheaton's Elements, 453.

2. It appears from the contract, and the allegations of the bill, on page 8 of the record, that the contract in this case was entered into, not only for the purpose of furnishing money to equip volunteers to carry on a war in Texas against Mexico, in aid of the revolutionists, but for the further illegal purpose of raising volunteers to proceed from this country. The contract was therefore void, as against the laws of the United States and our treaty of amity and friendship with Mexico. The contract was executed in Cincinnati, on the 16th September, 1836, and recites that General Chambers "is *now* engaged in raising, arming, and equipping volunteers for Texas," &c. Act of Congress, 1836, p. 53; Senate Journal, 1837, pp. 110, 310; Act of March 10, 1838, 5 Stat. at Large, 212; Ex. Doc. 1835, p. 183; Vol. 6, Doc. 256; Doc. 38, p. 36.

Mr. Chief Justice TANEY delivered the opinion of the court.

This is an appeal from the decree of the District Court of the United States for the District of Texas.

The appellants filed a bill in that court against the appellee, to obtain the specific execution of an agreement which is set out in full in the bill; and which they allege was executed at the city of Cincinnati, in the State of Ohio, on or about the 16th of September, 1836. Some of the complainants claim as original parties to the contract, and the others as assignees of original parties, who have sold and assigned to them their interest.

The contract, after stating that it was entered into on the day and year above mentioned, between General T. Jefferson Chambers, of the Texan army, of the first part, and Morgan Neville and six others, who are named in the agreement, of the city of Cincinnati, of the second part, proceeds to recite the motives and inducements of the parties in the following words: — 

" That the said party of the second part, being desirous of assisting the said General T. Jefferson Chambers, who is now engaged in raising, arming, and equipping volunteers for Texas, and who is in want of means therefor; and, being extremely desirous to advance the cause of freedom and the independence of Texas, have agreed to purchase of the said T. Jefferson Chambers, of his private estate, the lands hereinafter described."

And after this recital follows the agreement of Chambers, to sell and convey to them the land described in the agreement, situated in Texas, for the sum of twelve thousand five hundred dollars, which he acknowledged that he had received in their notes, payable in equal instalments of four, six, and twelve months, and he covenanted that he had a good title to this land, and would convey it with general warranty. There are other stipulations, on the part of Chambers, to secure the title to the parties, which it is unnecessary to state, as they are not material to the questions before the court.

After setting out the contract at large, the bill avers, that the notes given, as aforesaid, were all paid.; and sets forth the manner in which the complainants, who were not parties to the original contract, had acquired their interest as assignees; and charges that, notwithstanding the full payment of the money, Chambers, under different pretexts, refuses to convey the land, according to the terms of his agreement.

It further states, that they are informed and believe that he received full compensation, in money, scrip, land, or other valuable property, for the supplies furnished by him, and in arming and equipping the Texan army referred to in the said contract, and which it was in part the object of the said parties of the second part to assist him to do, by the said advances made by them, as before stated, and which said advances did enable the said Chambers so to do.

To this bill the respondent (Chambers) demurred, and the principal question which arises on the demurrer is, whether the contract was a legal and valid one, and such as can be enforced by either party in a court of the United States. It appears on the face of it, and by the averments of the appellants in their bill, that it was made in Cincinnati, with a general in the Texan army, who was then engaged in raising, arming, and equipping volunteers for Texas, to carry on hostilities with Mexico; and that one of the inducements of the appellants, in entering into this contract and advancing the money, was to assist him in accomplishing these objects.

The District Court decided that the contract was illegal and void, and sustained the demurrer and dismissed the bill; and we think that the decision was right.

The validity of this contract depends upon the relation in which this country then stood to Mexico and Texas; and the duties which these relations imposed upon the government and citizens of the United States.

Texas had declared itself independent a few months previous to this agreement. But it had not been acknowledged by the United States; and the constituted authorities charged with our foreign relations, regarded the treaties we had made with Mexico as still in full force, and obligatory upon both nations. By the treaty of limits, Texas had been admitted by our government to be a part of the Mexican territory; and by the first article of the treaty of amity, commerce, and navigation, it was declared, "that there should be a firm, inviolable, and universal peace, and a true and sincere friendship between the United States of America and the United Mexican States, in all the extent of their possessions and territories, and between their people and citizens respectively, without distinction of persons or place." These treaties, while they remained in force, were, by the Constitution of the United States, the supreme law, and binding not only upon the government, but upon every citizen. No contract could lawfully be made in violation of their provisions.

Undoubtedly, when Texas had achieved her independence, no previous treaty could bind this country to regard it as a part of the Mexican territory. But it belonged to the government, and not to individual citizens, to decide when that event had taken place. And that decision, according to the laws of nations, depended upon the question whether she had or had not a civil government in successful operation, capable of performing the duties and fulfilling the obligations of an independent power. It depended upon the state of the fact, and not upon the right which was in contest between the parties. And the

President, in his message to the Senate, of December 22, 1836, in relation to the conflict between Mexico and Texas, which was still pending, says: "All questions relative to the government of foreign nations, whether of the old or the new world, have been treated by the United States as questions of fact only, and our predecessors have cautiously abstained from deciding upon them until the clearest evidence was in their possession, to enable them not only to decide correctly, but to shield their decision from every unworthy imputation." Senate Journal of 1836, 37, p. 54.

Acting upon these principles, the independence of Texas was not acknowledged by the Government of the United States until the beginning of March, 1837. Up to that time, it was regarded as a part of the territory of Mexico. The treaty which admitted it to be so, was held to be still in force and binding on both parties, and every effort made by the government to fulfil its neutral obligations, and prevent our citizens from taking part in the conflict. This is evident, from an official communication from the President to the Governor of Tennessee, in reply to an inquiry in relation to a requisition for militia, made by General Gaines. The despatch is dated in August, 1836; and the President uses the following language: " The obligations of our treaty with Mexico, as well as the general principles which govern our intercourse with foreign powers, require us to maintain a strict neutrality in the contest which now agitates a part of that republic. So long as Mexico fulfils her duties to us, as they are defined by the treaty, and violates none of the rights which are secured by it to our citizens, any act on the part of the Government of the United States, which would tend to foster a spirit of resistance to her government and laws, whatever may be their character or form, when administered within her own limits and jurisdiction, would be unauthorized and highly improper. Ex. Doc. 1836, 1837, Vol. 1, Doc. 2, p. 58.

And on the very day on which the agreement of which we are speaking, was made, (September 16, 1836,) Mr. Forsyth, the Secretary of State, in a note to the Mexican Minister, assured him that the government had taken measures to secure the execution of the laws for preserving the neutrality of the United States, and that the public officers were vigilant in the discharge of that duty. Ex Doc. Vol. 1, Doc. 2, page 63 – 64.

And still later; the President, in his message to the Senate of December 22, 1836, before referred to, says: " The acknowledgment of a new State as independent, and entitled to a place in the family of nations, is at all times an act of great delicacy and responsibility; but more especially so when such a State has

forcibly separated itself from another, of which it formed an integral part, and which still claims dominion over it." And, after speaking of the policy which our government had always adopted on such occasions, and the duty of maintaining the established character of the United States for fair and impartial dealing, he proceeds to express his opinion against the acknowledgment of the independence of Texas, at that time, in the following words : —

" It is true, with regard to Texas, the civil authority of Mexico has been expelled, its invading army defeated, the chief of the republic himself captured, and all present power to control the newly organized Government of Texas annihilated within its confines. But, on the other hand, there is, in appearance at least, an immense disparity of physical force on the side of Mexico. The Mexican republic, under another executive, is rallying its forces under a new leader, and menacing a fresh invasion to recover its lost dominion. Upon the issue of this threatened invasion, the independence of Texas may be considered as suspended; and, were there nothing peculiar in the relative situation of the United States and Texas, our acknowledgment of its independence at such a crisis would scarcely be regarded as consistent with that prudent reserve with which we have heretofore held ourselves bound to treat all similar questions."

The whole object of this message appears to have been to impress upon Congress the impropriety of acknowledging the independence of Texas at that time; and the more especially as the American character of her population, and her known desire to become a State of this Union, might, if prematurely acknowledged, bring suspicion upon the motives by which we were governed.

We have given these extracts from the public documents not only to show that, in the judgment of our government, Texas had not established its independence when this contract was made, but to show also how anxiously the constituted authorities were endeavoring to maintain untarnished the honor of the country, and to place it above the suspicion of taking any part in the conflict.

This being the attitude in which the government stood, and this its open and avowed policy, upon what grounds can the parties to such a contract as this, come into a court of justice of the United States and ask for its specific execution ? It was made in direct opposition to the policy of the government, to which it was the duty of every citizen to conform. And, while they saw it exerting all its power to fulfil in good faith its neutral obligations, they made themselves parties to the war, by

furnishing means to a general of the Texan army, for the avowed purpose of aiding and assisting him in his military operations.

It might indeed fairly be inferred, from the language of the contract and the statements in the appellants' bill, that the volunteers were to be raised, armed, and equipped within the limits of the United States. The language of the contract is : " That the said party of the second part, (that is the complainants,) being desirous of assisting the said General T. Jefferson Chambers, who is now engaged in raising, arming, and equipping volunteers for Texas, and is in want of means therefor." And as General Chambers was then in the United States, and was, as the contract states, actually engaged at that time in raising, arming, and equipping volunteers, and was in want of means to accomplish his object, the inference would seem to be almost irresistible that these preparations were making at or near the place where the agreement was made, and that the money was advanced to enable him to raise and equip a military force in the United States. And this inference is the stronger, because no place is mentioned where these preparations are to be made, and the agreement contains no engagement on his part, or proviso on theirs, which prohibited him from using these means and making these military preparations within the limits of the United States.

If this be the correct interpretation of the agreement, the contract is not only void, but the parties who advanced the money were liable to be punished in a criminal prosecution, for a violation of the neutrality laws of the United States. And certainly, with such strong indications of a criminal intent, and without any averment in the bill from which their innocence can be inferred, a court of chancery would never lend its aid to carry the agreement into specific execution, but would leave the parties to seek their remedy at law. And this ground would of itself be sufficient to justify the decree of the District Court dismissing the bill.

But the decision stands on broader and firmer ground, and this agreement cannot be sustained either at law or in equity. The question is not whether the parties to this contract violated the neutrality laws of the United States or subjected themselves to a criminal prosecution ; but whether such a contract, made at that time, within the United States, for the purposes stated in the contract and the bill of complaint, was a legal and valid contract, and such as to entitle either party to the aid of the courts of justice of the United States to enforce its execution.

The intercourse of this country with foreign nations, and its policy in regard to them, are placed by the Constitution of the

United States in the h. nds of the government, and its decisions upon these subjects a ꞌ obligatory upon every citizen of the Union. He is bound to be at war with the nation against which the war-making power has declared war, and equally bound to commit no act of hostility against a nation with which the government is in amity and friendship. This principle is universally acknowledged by the laws of nations. It lies at the foundation of all government, as there could be no social order or peaceful relations between the citizens of different countries without it. It is, however, more emphatically true in relation to citizens of the United States. For as the sovereignty resides in the people, every citizen is a portion of it, and is himself personally bound by the laws which the representatives of the sovereignty may pass, or the treaties into which they may enter, within the scope of their delegated authority. And when that authority has plighted its faith to another nation that there shall be peace and friendship between the citizens of the two countries, every citizen of the United States is equally and personally pledged. The compact is made by the department of the government upon which he himself has agreed to confer the power. It is his own personal compact as a portion of the sovereignty in whose behalf it is made. And he can do no act, nor enter into any agreement to promote or encourage revolt or hostilities against the territories of a country with which our government is pledged by treaty to be at peace, without a breach of his duty as a citizen, and the breach of the faith pledged to the foreign nation. And if he does so he cannot claim the aid of a court of justice to enforce it. The appellants say, in their contract, that they were induced to advance the money by the desire to promote the cause of freedom. But our own freedom cannot be preserved without obedience to our own laws, nor social order preserved if the judicial branch of the government countenanced and sustained contracts made in violation of the duties which the law imposes, or in contravention of the known and established policy of the political department, acting within the limits of its constitutional power.

But it has been urged in the argument that Texas was in fact independent, and a sovereign state at the time of this agreement; and that the citizen of a neutral nation may lawfully lend money to one that is engaged in war, to enable it to carry on hostilities against its enemy.

It is not necessary, in the case before us, to decide how far the judicial tribunals of the United States would enforce a contract like this, when two states, acknowledged to be independent, were at war, and this country neutral. It is a sufficient answer to the argument to say that the question whether Texas had or

had not at that time become an independent state, was a question for that department of our government exclusively which is charged with our foreign relations. And until the period when that department recognized it as an independent state, the judicial tribunals of the country were bound to consider the old order of things as having continued, and to regard Texas as a part of the Mexican territory. And if we undertook to inquire whether she had not in fact become an independent sovereign state before she was recognized as such by the treaty-making power, we should take upon ourselves the exercise of political authority, for which a judicial tribunal is wholly unfit, and which the Constitution has conferred exclusively upon another department.

This is not a new question. It came before the court in the case of Rose *v.* Himely, 4 Cr. 272, and again in Hoyt *v.* Gelston, 3 Wheat. 324. And in both of these cases the court said, that it belongs exclusively to governments to recognize new states in the revolutions which may occur in the world; and until such recognition, either by our own government or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining unaltered.

It was upon this ground that the Court of Common Pleas in England, in the case of De Wutz *v.* Hendricks, 9 Moore's C. B. Reports, 586, decided that it was contrary to the law of nations for persons residing in England to enter into engagements to raise money by way of loan for the purpose of supporting subjects of a foreign state in arms against a government in friendship with England, and that no right of action attached upon any such contract. And this decision is quoted with approbation by Chancellor Kent, in 1 Kent's Com. 116.

Nor can the subsequent acknowledgment of the independence of Texas, and her admission into the Union as a sovereign State, affect the question. The agreement being illegal and absolutely void at the time it was made, it can derive no force or validity from events which afterwards happened.

But it is insisted, on the part of the appellants, that this contract was to be executed in Texas, and was valid by the laws of Texas, and that the District Court for that State, in a controversy between individuals, was bound to administer the laws of the State, and ought therefore to have enforced this agreement.

This argument is founded in part on a mistake of the fact. The contract was not only made in Cincinnati, but all the stipulations on the part of the appellants were to be performed there and not in Texas. And the advance of money which they

agreed to make for military purposes was in fact made and intended to be made in Cincinnati, by the delivery of their promissory notes, which were accepted by the appellee as payment of the money. This appears on the face of the contract. And it is this advance of money for the purposes mentioned in the agreement, in contravention of the neutral obligations and policy of the United States, that avoids the contract. The mere agreement to accept a conveyance of land lying in Texas, for a valuable consideration paid by them, would have been free from objection.

But had the fact been otherwise, certainly no law of Texas then or now in force could absolve a citizen of the United States, while he continued such, from his duty to this government, nor compel a court of the United States to support a contract, no matter where made or where to be executed, if that contract was in violation of their laws, or contravened the public policy of the government, or was in conflict with subsisting treaties with a foreign nation.

We therefore hold this contract to be illegal and void, and affirm the decree of the District Court.

Mr. Justice DANIEL and Mr. Justice GRIER dissented.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Texas, and was argued by counsel. On consideration whereof it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, affirmed with costs.