· COÖS. ·

---

### JEWELL v. GILBERT.

A person serving a writ as a deputy specially appointed by the sheriff is an officer *de facto* for that purpose, although his written appointment is not under seal.

ASSUMPSIT.  Facts found by a referee.  The plaintiff furnished the defendant with supplies toward hauling wood, and claimed a lien under Gen. Laws, c. 139, s. 13.  The Grand Trunk Railway Company appeared as claimant of the wood, and objected to the rendition of a judgment *in rem*, on the ground that a lien had not been secured by attachment.  The attachment was made by Graham, whose appointment as a special deputy for the service and return of the writ was not under seal.

*A. S. Twitchell, A. R. Evans,* and *A. L. Chamberlain,* for the plaintiff.

*Drew, Jordan & Carpenter,* for the claimant.

DOE, C. J. "The *de facto* doctrine was introduced into the law as a matter of policy and necessity, to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers. It was seen   \*   \*   \*   that the public could not reasonably be compelled to inquire into the title of an officer, nor be compelled to show a title, and these became settled principles in the law. But to protect those who dealt with such officers when apparent incumbents of offices under such apparent circumstances of reputation or color as would lead men to suppose they were legal officers, the law validated their acts as to the public and third persons, on the ground that, as to them, although not officers *de jure*, they were officers in fact, whose acts public policy required should be considered valid."   *State* v. *Carroll*, 38 Conn. 449, 467. "Upon well settled principles, it would be inconsistent with the convenience and security of the public, and with a due regard to the rights of one acting in an official capacity under the color of and a belief in lawful authority to do so, that the validity of his acts as a justice should be disputed, or the legal effect of his election and qualification as a representative be determined, in this proceeding to which he is not a party. The appropriate form of trying his right to exercise the office of a justice is by information in behalf of the commonwealth, or perhaps by action against him by the person injured."   *Sheehan's Case*, 122 Mass. 445, 446. "The acts of an officer, thus having color of title   \*   \*   \*   , are valid in respect to the rights of third persons.   \*   \*   \*   The adoption of such a rule is necessary to prevent a failure of justice, and the great public mischief which might otherwise be justly apprehended. Besides, the officer's title to his office ought not to be determined in a collateral way."   *Bucknam* v. *Ruggles*, 15 Mass. 180, 182.

"It is difficult to find a stronger illustration of the application of this rule than is furnished by the case of *Fowler* v. *Bebee*, 9 Mass. 231, where it was held that the acts of an officer, appointed without any authority of law, could not be invalidated or inquired into in a suit between third persons.   \*   \*   \*   The cases all recognize the rule as being founded on public policy, which does not allow the title of a person to an office to be inquired into and determined in proceedings to which he is not a party; nor the rights of third persons to be affected by illegalities or informalities in the appointment or election of public officers who are acting under color of title."   *F. R. Co.* v. *G. J. Co.*, 1 Allen 552, 558. "No principle is better settled than that the acts of such persons are valid when they concern the public, or the rights of third persons.   \*   \*   \*   It would be impossible to maintain the supremacy of the laws, if individuals were at liberty, in this collateral manner, to question the authority of those who, in fact, hold public offices under color of legal title."   *People* v. *White*, 24 Wend. 520, 525.

"In order to secure the peaceful and orderly government of the community, the rule has been established that the right of a *de facto* public officer to exercise the powers of his office cannot be investigated in a collateral proceeding. It must be determined once for all times in a direct proceeding to oust the officer." Morawetz, Corporations (2d ed) *s.* 640.

In the reign of Henry VI, "the house of York asserted their dormant title; and after imbruing the kingdom in blood and confusion for seven years together, at last established it in the person of Edward IV. At his accession to the throne, after a breach of the succession that continued for three descents, and above threescore years, the distinction of a king *de jure* and a king *de facto* began to be first taken; in order to indemnify such as had submitted to the late establishment, and to provide for the peace of the kingdom, by confirming all honors conferred and all acts done by those who were now called the usurpers, not tending to the disherison of the rightful heir. In statute 1 Edw. IV, *c.* 1, the three Henrys are styled 'late kings of England successively in dede, and not of ryght.' And in all the charters which I have met with of King Edward, wherever he has occasion to speak of any of the line of Lancaster, he calls them '*nuper de facto, et non de jure, reges Angliæ.*'" 1 Bl. Com. 204.

"When an unjust conqueror, or any other usurper, having invaded the kingdom, on the people submitting to him, and by a voluntary homage acknowledging him for their sovereign, he is in possession of their regality. Other nations, as having no right to concern themselves in the domestic affairs of this nation, or to interfere in its government, are to abide by its judgment, and conform to the possession; therefore they may treat of a peace with the usurper, and conclude it with him. Herein they do not injure the right of the lawful sovereign; it is not their concern to examine and judge of this right; they leave it as it is, and in their transactions with this kingdom, attach themselves solely to the possession, according to their own right, and that of the state whose sovereignty is contested." Vattel, Law of Nations, *b.* 4, *s.* 14.

"A new state, springing into existence, does not require the recognition of other states to confirm its internal sovereignty. The existence of the state *de facto* is sufficient, in this respect, to establish its sovereignty *de jure.* It is a state because it exists. * * * The external sovereignty of any state, on the other hand, may require recognition by other states in order to render it perfect and complete. * * * Until the revolution is consummated, whilst the civil war involving a contest for the government continues, other states may remain indifferent spectators of the controversy, still continuing to treat the ancient government as sovereign, and the government *de facto* as a society entitled to the rights of war against its enemy." Wheaton, International Law

(8th ed.), *ss.* 21, 23, 27, *n.;* 1 Kent Com. 24, 25, 167 ; *Kennett* v. *Chambers*, 14 How. 38, 47 ; *Prize Cases*, 2 Black 635.

In *Luther* v. *Borden*, 7 How. 1, the plaintiff offered to prove that the Dorr government was lawfully established in Rhode Island in May, 1842, and was the state government *de jure* until May, 1843 ; and he contended that the charter government, which existed *de facto*, having no legal existence during that year, could not authorize the defendants to break and enter the plaintiff's house in order to arrest him. "If this court," says *Taney*, C. J. (p. 38), "is authorized to enter upon this inquiry, as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned, if it had been annulled by the adoption of the opposing government, then the laws passed by its legislature during that time were nullities ; its taxes wrongfully collected ; its salaries and compensation to its officers illegally paid ; its public accounts improperly settled ; and the judgments and sentences of its courts, in civil and criminal cases, null and void, and the officers who carried their decisions into operation, answerable as trespassers, if not in some cases as criminals." "Sir Matthew Hale," says *Woodbury*, J. (p. 57), "after much hesitation, at last consented to preside on the bench in administering the laws between private parties, under a government established, and recognized by other governments, and in full possession *de facto* of the records and power of the kingdom, but without feeling satisfied on inquiry, as a judicial question, into its legal rights. Cromwell had 'gotten possession of the government,' and expressed a willingness 'to rule according to the laws of the land.' * * * And this, Hale thought, justified him in acting as judge. Hale's Hist. of the Com. Law, *p.* 14, preface. For a like reason, though the power of Cromwell was soon after overturned, and Charles the Second restored, the judicial decisions under the former remained unmolested on this account, and the judiciary went on as before, still looking only to the *de facto* government for the time being. Grotius virtually holds the like doctrine. B. 1, *c.* 4, *s.* 20, and B. 2, *c.* 13, *s.* 11. Such was the case, likewise, over most of this country, after the declaration of independence, till the acknowledgment of it by England in 1783. 3 Story, Com. on Const., *ss.* 214, 215. And such is believed to have been the course in France under all her dynasties and regimes during the last half century."

"The legislature of Texas," in 1862, "constituted one of the departments of a state government established in hostility to the constitution of the United States. It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful acts. And yet it is an historical fact that the government of Texas, then in full control of the state, was its only actual government ; and certainly if Texas had been a separate state, and not one of the United States, the new gov-

ernment, having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a *de facto* government ; and its acts, during the period of its existence as such, would be effectual, and in almost all respects valid.   And to some extent this is true of the actual government of Texas, though unlawful and revolutionary as to the United States.   It is not necessary to attempt any exact definitions within which the acts of such a state government must be treated as valid, or invalid.   It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government ; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must in general be regarded as invalid and void."   *Texas* v. *White*, 7 Wall. 700, 732.

In *Despatch Line* v. *Bellamy Co.*, 12 N. H. 205, 210, 223, one ground on which the plaintiff contested the validity of a mortgage executed by Palmer (who was a director, and assumed to act as the agent, of the defendant company) was, that the election of Emery as a director was illegal because he was not a stockholder. The mortgage was made in pursuance of what purported to be a record of a vote of the directors passed by Palmer and Emery when they met on their private business.   Palmer told Emery he wanted to make a mortgage of the company's property.   Emery replied that he could not act, never having had any stock ; but Palmer said he was chosen a director.   Emery at last said he had " no objection to look on ; " and at Palmer's request, he wrote a form for a vote authorizing the mortgage.   The court say, if the election of Emery " had been by a municipal corporation, coming into office under color of an election, he would have been an officer *de facto*, and his acts valid so far as third persons had an interest in them.   And the regularity of the election could not in such case be inquired into, except in some proceeding to which he was a party.   *Tucker* v. *Aiken*, 7 N. H. 131, 135, and cases cited.   As a director of a private corporation, although called in common parlance an officer of the corporation, he is perhaps not technically to be considered an officer *de facto*.   He is one of the agents elected by a vote of the corporation for the management of its affairs, or some of them.   But a similar rule must prevail in relation to the effect of his acts so far as the corporation have held him out as an agent, and third persons have confided in his acts done within the

scope of the authority he appeared to possess." .Morawetz, Corporations (2d ed.), ss. 543 a, 637–640.

Irregular corporate "elections are voidable only, and not void. These directors at most are irregularly chosen. They are in under color of an election, and their acts, so long as they retain their offices, are binding. The legality of their election cannot be brought collaterally in question, but proceedings should be instituted for the express purpose of trying it, and of evicting them." *Hughes* v. *Parker*, 20 N. H. 58, 72; *Ins. Co.* v. *Moore*, 55 N. H. 48. There may be *de facto* corporations (Morawetz, Corporations, ss. 696 a, 710, 711, 745–778, 1002, 1008, 1015, 1030), *de facto* schools and school-masters *(Kidder* v. *Chellis*, 59 N. H. 473, 475, 476), and *de facto* school-houses. *Chapin* v. *School Dist.*, 30 N. H. 25, 31. A deed without a seal may be color of title. *Farrar* v. *Fessenden*, 39 N. H. 268, 280.

" The selectmen, who commit the list of taxes to the collector, may have, it is true, more knowledge of the circumstances under which he was chosen and came into office than individuals ordinarily have respecting the particular circumstances attending the appointment of a sheriff or his deputy; but still it may impose quite as great a hardship to require them to judge at their peril of the legal validity of those proceedings, and make them answerable personally for irregularities which did not originate with them, which they could not control, and respecting the legality of which they have but inadequate means of forming an opinion. If the town proceeds to elect, their duty requires them to commit the list of taxes to the collector chosen, if the election be legal, and they have not the power to try the legality of the election, and to enter a judgment of ouster. If they are required to judge of the validity of the proceedings, they must do so without trial, and at their own peril, if they mistake." *Tucker* v. *Aiken*, 7 N. H. 113, 132.

In that case the election of Stowell as tax-collector of Derry was held to be illegal " because the office of collector was set up at auction, and the lowest bidder elected." If the selectmen could have legally appointed a collector on the ground that the election being illegal the office was vacant (Act of Feb. 8, 1791, s. 8), they were not bound, of their own motion, to make an appointment. They could not judicially try, and they were not bound to decide without trial, the question of Stowell's title. Their right to treat him as a collector *de facto*, and to rely upon his colorable title in committing to him the list of taxes, was not derived from their inadequate means of forming an opinion of the legality of the election. Evidence that they were learned in the law, were aware of all the facts, and knew his election was illegal, would have been inadmissible. If the judges who decided that case in 1834 had been selectmen of Derry the next year, had been present when the office of collector was again sold at auction, and when the lowest bidder was again illegally elected, they could have legally employed

him as collector. In relation to a vast number of official acts in the Confederate states, the *de facto* rule does not discriminate in favor of those who thought the government of those states was legally established, or against those who entertained the contrary opinion. If A and B claim the office of register of deeds, B having color of title, and both having knowledge that the legal title is in A, B's recording a deed in which A is grantee is not invalidated by that knowledge, or by A's prosecution of a suit against B for the office when he employed him to make the record: A is protected against a collateral contestation of the colorable title which he directly and successfully attacks by process of law. In such a case the safety of every grantee does not depend upon his belief in the legality of the register's election, or upon the register's ignorance of an electoral matter of law or fact, or upon an error in the register's opinion on such a subject.

The assessment and collection of an illegal tax may be an official duty. *School-District* v. *Carr*, 63 N. H. 201, 205; *Gove* v. *Newton*, 58 N. H. 359; *Bell* v. *Railroad Co.*, 4 Wall. 598. The safety of society requires the police to act with alacrity upon a merely apparent state of things. *O'Connor* v. *Bucklin*, 59 N. H. 589, 591. The necessity of safe reliance on what is apparent though unreal authorizes an unofficial use of force upon an appearance of a danger that does not exist. *Aldrich* v. *Wright*, 53 N. H. 398. While generalization is dangerous, the judicial acceptance of the application that has been made of a broad principle to the narrow facts of particular cases, as a full exposition of it, may be a repeal of a large part of a salutary provision of law, and an enactment of a contrary provision in its place.

An office may be held *de facto* by a person whose legal incapacity to hold it is imposed upon him by a prohibitory provision of the constitution. *Sheehan's Case*, 122 Mass. 445; *Tyler* v. *Flanders*, 58 N. H. 371. His disability may arise from a fact that is not apparent. But the principle that forbids a collateral inquiry into the validity of an appointment or election has a broader foundation than a latent defect discoverable only in extraneous evidence. A colorable appointment may be made by a body or person whose total lack of appointing power is matter of law. An unconstitutional statute, void on its face, can give color of official title. A person called in on a single occasion to exercise a power which the void statute purports to confer upon him may be an officer *de facto*, whose title cannot be assailed collaterally. *State* v. *Carroll*, 38 Conn. 449. If the appointment of Graham to the constitutional office of special deputy had been under seal, but the statutory provision under which it was made had been unconstitutional and void, he would have been a deputy *de facto*, and his authority could not have been questioned in this suit; and for the purposes of this suit, whatever may be the efficacy of a seal, a failure to comply with a statute requiring it would not be a greater flaw than the

invalidity of the statute. If the law required a seal, the want of it is a legal and technical defect that would. be no more apparent to people in general than the unconstitutionality of the law.

By the general rule, official title is not triable collaterally, a colorable title is indisputable when it ought not to be disputed, and it ought not to be attacked except in an appropriate action brought for the special purpose of establishing the legal title, in which action the officer *de facto*, being a party, will be bound by the judgment. The impracticability of preventing the service of this plaintiff's writ by judgment of ouster in a *quo warranto* against Graham is no cause for trying the validity of his appointment in this suit. The sheriff "is responsible for the official conduct of his deputies. He shall, by himself or his deputies, serve and execute, in his county, all writs and other precepts to him directed." G. L., c. 216, *ss.* 2, 3. The sheriff signed the writing specifically purporting to authorize Graham to serve the writ; and for what was done in pursuance of that writing the sheriff was responsible, whether Graham was his agent *de facto* and *de jure*, or only *de facto*. Graham's official claim having begun and ended with the service of this writ, there is now no need of an opportunity to contest his claim in a *quo warranto*. See cases cited in *Att'y Gen.* v. *Megin*, 63 N. H. 378. . If anything he did would have been wrongful with a seal on his warrant, it was wrongful without a seal. If with a seal his attachment would have been rightful, there was no reason why the plaintiff should not safely rely upon his apparent .authority to make it. Without a seal, his appointment was apparent authority within the meaning of the *de facto* rule. That rule, being a law of justice and reason, and not an arbitrary ordinance enacted by a court, does not exclude the learned or the unlearned from its protection, and did not require the plaintiff to try Graham's appointment by the test of such authority as would be apparent to the few who enjoy the advantage of a legal education.

The theory that proof of a person's being an officer *de facto* is *prima facie* evidence of his being an officer *de jure*, and that his authority is disproved by evidence that he is not an officer *de jure* (*Pierce* v. *Richardson*, 37 N. H. 306, 309). may be a rule of evidence in some cases (*Doe* v. *Young*, 8 Q. B. 63, *Doe* v. *Barnes*, 8 Q. B. 1037, *M'Mahon* v. *Lennard*, 6 H. L. Cas. 970, 1000, 1011, *King* v. *Hollond*, 5 T. R. 607, 623), but it is not generally applicable to cases in which such person is not a party. The *de facto* principle is not a mere rule of evidence in judicial trials. It invests an act of a *de facto* officer with a practical validity that is indispensable for the safe transaction of a great variety of business. "The acts of an officer *de facto* are valid when they concern the public or the rights of third persons." *Prescott* v. *Hayes*, 42 N. H. 56, 58. The original right of this plaintiff was not to introduce either *prima facie* or conclusive evidence on a collateral trial of the legality of Graham's official title, but to have a valid attachment made by his

exercise of his apparent authority, whether his appointment was legal or illegal. The question whether a seal was necessary to make him a deputy *de jure* (G. L., c. 216, ss. 1, 2, *Davis* v. *Clements*, 2 N. H. 390, *Thompson* v. *Fellows*, 21 N. H. 425) need not be considered.

*Objection overruled.*

BLODGETT, J., did not sit: the others concurred.