Reed, Justice (Bet.),
sitting by designation, delivered the opinion of the court:
This proceeding was started in the Indian Claims Commission [1] as a claim by the Creek Nation of Oklahoma for lands obtained from the Creek Nation of Indians by the United States in August, 1814, under the treaty of Fort Jackson.[2] The lands in question comprise a substantial portion of southern Alabama and lesser parts of western Georgia. In 1951 the present appellant, the Creek Nation *481 East of the Mississippi, sought to intervene but was denied permission to do so.[3] This court reversed, holding that intervention was proper in that any recovery should inure to the benefit of all Creeks as descendants of the Creek Nation of 1814.[4] While the intervention issue was before this court, the Commission entered an order in favor of the Oklahoma Creeks as representative of the Creek Nation for 8,849,940 of the 23,267,600 acres in dispute. Relief was denied as to the remaining land.[5]
After this court’s decision on the intervention issue, the Commission opened the case for further evidence on the question presented by this appeal — the impact of the Treaty of Ghent on the Creek claim. Subsequently the Commission made additional findings and denied further relief based on the treaty.[6] There was no occasion to consider further the value or acreage of the lands for which relief was denied. The next eight years were consumed by litigation concerning the value of the lands and adjustments to the acreage of the 8,849,940 acre tract.[7]
This appeal is prosecuted by the Creek Nation East of the Mississippi. The principal issue is the Commission’s rejection of the argument that Article 9 of the Treaty of Ghent requires that the Creeks recover for the entire 23,-267,600 acres rather than the 8,849,940 awarded under another theory by the Commission.
At least from 1790, as indicated by the treaty then made at New York, the Creek Nation had constituted a rudimentary political entity.[8] That treaty drew a definitive line between the lands of the white citizens of the United States to the north and east in Georgia and the Creek Nation lands to the south and west in Georgia and what is now Alabama and Florida. In 1799 the Creeks brought a somewhat nebulous form of government into being by classifying all *482 tbe towns and appointing a warrior oyer eacb — “tbe warrior of tbe nation.”[9]
In early 1813, in the midst of tbe War of 1812, a large part of the Creek Nation,[10] referred to as tbe hostiles, rose against tbe tribal authorities in a tribal civil war[11] and shortly became engaged in a number of battles with American troops who intervened on tbe side of tbe Creeks friendly to tbe United States.[12]
By April, 1814, the majority of tbe so-called hostile Creeks bad been driven out of Alabama and bad joined tbe British and Seminóles in Florida. The hostiles continued to engage in attacks on tbe American border until ultimately conquered in tbe Seminole War of 1819.[13] Gen. Pinckney, in 1814 in command of tbe United States forces, was then directed by tbe Secretary of War to conclude a treaty of “a form altogether military, and ... in tbe nature of a capitulation.”[14] Andrew Jackson, who succeeded Pinckney in command, arranged tbe Treaty of Fort Jackson, whereby a council of 36 Creek chiefs, 35 of whom bad remained friendly to the United States, ceded under protest tbe lands here in dispute to tbe United States as an indemnity for the costs of tbe Creek War. Tbe treaty was signed on August 9, 1814, and ratified and proclaimed on February 16, 1815, 7 Stat. 120.
*483 The Treaty of Ghent, concluding the War of 1812, was signed on December 24, 1814, and proclaimed on February 18,1815. Article 9 of that treaty was made applicable to the Indian tribes in this language:
“The United States of America engage to put an end, immediately after the ratification of the present treaty, to. hostilities with all the tribes or nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights and privileges which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities: Provided always, That such tribes or nations shall agree to desist from all hostilities against the United States of America, their citizens and subjects upon the ratification of the present treaty being notified to such tribes or nations, and shall so desist accordingly.” 8 Stat. 222-223.
Both combatants were concerned to protect their Indian allies, but neither could be more specific since the lands and the participation of the Indians in the War of 1812 were not definitely known to the Commissioners. The above quoted provision was a compromise of the British desire for an Indian buffer state between the United States and Spanish and British lands.[15]
On April 28, 1815, the hostile Creeks submitted a purported acceptance of the terms of Article 9, signing it as “an independent people.”[16]
The Eastern Creeks now claim that they were at war with the United States at the time of the ratification of the Treaty of Ghent, that they complied with the proviso that they cease hosilities, and that they were accordingly entitled to be restored to their lands as held in 1811.
The Commission found that the Creek war was not a part of the War of 1812, but was rather a civil war within the tribe.[17] It also found that the 36 chiefs with whom Jackson concluded the Treaty of Fort Jackson were the *484 de jure government of the tribe.[18] In the Commission’s initial award the Creeks were compensated for the 8,849,940 acres on the ground that the chiefs had not willingly consented to the taking of all the Creek lands. The portion occupied exclusively by the friendly Creeks was held to have been taken in violation of the United States’ obligation to deal fairly and honorably with the Indians. As to the remainder, however, the Commission held that because the hostiles were at war with the friendly Indians as well as with the United States, the de jwre government of the tribe, comprised largely of friendly Creeks, did not object to the taking of the hostiles’ land.[19]
The second Commission decision denied recovery under the Treaty of Ghent, an issue raised for the first time by the intervening eastern Creeks. We agree that the treaty does not provide a basis for recovery as to the lands ceded under the Treaty of Fort Jackson. The issue is one of treaty interpretation, first as to whether the Creeks were “at war” with the United States on February 18, 1815, and then, if necessary, whether the Creeks complied with the requirement that they cease hostilities against the United States.
We agree with the Commission that the Creeks are not beneficiaries of the Ghent agreement. The Fort Jackson treaty had been entered into before the Treaty of Ghent was made and became effective by proclamation before the ratification of the Ghent treaty. Under the Fort Jackson treaty “a permanent peace” was effected between the United States and the Creek Nation.[20] The Commission found that the representatives of the Creek Nation signing the treaty were the de jwre government of the nation.[21] In these circumstances it is not surprising that the Commission did not find the hostiles to be “at war” with the United States after the Treaty of Fort Jackson. No hostilities were ever author *485 ized by tbe Creek Nation in the War of 1812.[22] Under the provision of the Treaty of Ghent quoted above, either the Creeks had engaged in war with the United States and if so the Treaty of Fort Jackson ended that war, or they were not at war with the United States and therefore the Ghent treaty did not apply to them.
Contemporary statements of government officers, including John Quincy Adams and the then Secretary of State James Monroe, express unequivocally the view that the Creeks were not within the ambit of Article 9.[23]
It is also noteworthy that the British at no time objected to the United States’ inattention to the Creeks as a violation of the Treaty.
If the 1814 Ghent treaty had been interpreted by the United States to cover Creeks, the Commissioners, to carry out the treaty, would have been instructed to deal with them as they dealt with other tribes.[24] However, no commissioner was ever appointed to treat with the Creeks in implementation of the Treaty of Ghent. This circumstance is particularly forceful in view of the appointment of commissioners to deal with the Wyandots and other northwestern tribes *486 who had also concluded peace treaties with the United States prior to the ratification of the Ghent agreement. The correspondence of the commissioner with the Secretary of War indicates that the treaty with the Wyandots was not deemed necessary, but was rather thought to be a political expedient in view of the possible tribal jealousies that might arise in the Northwest if some but not all tribes were restored to their lands.[25] We are directed to no comparable evidence relating to the Creeks.
It thus appears from all the evidence that the executive branch did not regard the Creeks as entitled to the benefits of Article 9. The interpretation of the executive is, of course, entitled to great weight in evaluating the impact of a treaty.[26]
In support of its view that the Creeks were within the meaning of Article 9, the appellant Creeks contend that the hostiles were to be treated as the Wyandots and other tribes with whom the United States concluded a second treaty after the Treaty of Ghent. But the facts that the hostiles were not themselves a political entity and that the de jure government of the Creeks was at peace with the United States are dispositive here. It was thought that there was nothing more for the United States to do about the hostiles because the hostiles were not a separate tribe. Whether this conclusion was correct in fact or in law or whether it was merely resort to a legal fiction is not the question. The crucial factor is that in 1815 the Treaty of Ghent was deemed inapplicable to the Creeks on that ground. We find nothing in the language or history of the treaty to override this conclusion.
Because we hold that the Creeks are not beneficiaries of the Treaty of Ghent, we do not pass on the question whether they complied with the treaty proviso that they cease hostilities.
There remains one further argument of the appellant Creeks. It is contended that the friendly Creeks were allies of the United States and that the imposition of the harsh *487 terms of the Fort Jackson treaty amounts to a violation of international law and a breach of the obligation to deal fairly and honorably with the Indian tribes. This argument, however, is no more than a restatement of the ground upon which the Commission awarded relief to the Creek Nation in the 1952 proceeding. The Creek Nation has been compensated for that portion of its lands inhabited by the friendly Indians and the award for those 8,849,940 acres is not here in dispute. The finding of the Commission in the first proceeding that the Creek Nation agreed to the cession of the hostiles’ land is not challenged here and is fatal to the Creek’s position.

Affirmed.

Jones, GMef Judge, and Davis, Judge, took no part in the consideration and decision of this case.

 60 stat. 10.49 (1946), 25 U.S.C. § 70 ff. (1958).

 7 Stat. 120.

 1 Ind. Cl. Comm. 546.

 McGhee v. United States, 122 Ct. Cl. 380 (1952), cert. denied 344 U.S. 856. Cf. United States v. Cherokee Nation, 202 US. 101, 128-131.

 2 Ind. Cl. Comm. 98 (1952).

 3 Ind. Cl. Comm. 455 (1955).

 4 Ind. Cl. Comm. 140 (1955); 6 Ind. Cl. Comm. 691 (1958); 11 Ind. Cl. Comm. 53 (1962).

 7 Stat. 35.

 Hargett, A Bibliography of The Constitutions and Laws of the American Indians (1947), chap. on The Creek Nation, p. 78, 79.

 The exact proportions do not appear in the record.

 3 Ind. Cl. Comm. 460, Finding 54; 2 Ind. Cl. Comm. 77. See Pound, Benjamin Hawkins — Indian Agent 223 et seq. (1951).

 Prucha, American Indian Policy (1962), pp. 76-77 :
“There had always been irritation on account of these foreigners in the heart of the West, and little by little the British traders were pushed out of the trade south of the Lakes, but it was the War of 1812 that fully opened the eyes of the Americans to the danger, for it was through the influence of the traders that the Indians fought with the British against the Americans in the war. Whatever may be the scholars’ final decision on the influence that Indian incitation had as a cause of the War of 1812, at the conclusion of the conflict it was clear that many Indians had indeed been loyal to the foreigners and not to the united States. There had been too many evidences of atrocities committed by the Indians to make it possible for the British to continue in the same position as before the war. By the Treaty of Ghent the British were forced, finally, to give up their posts in American territory, but the treaty did not prevent the old traders from continuing to operate within the United States from centers outside or to draw the Indians across the boundary to trade.”

 Finding 55, 3 Ind. Cl. Comm. 460.

 State Papers 1 Indian Affairs 837.

 Bierne, War of 1812, 380-86.

 Finding 51, 3 Ind. Cl. Comm. 458.

 Finding 12, as amended, 3 Ind. Cl. Comm. 462.

 Finding 30, 2 Ind. Cl. Comm 88. It is relevant to note that the recognition of a revolutionary government is a matter for the executive branch. Until the executive has recognized a government the courts are bound to regard the former state of affairs as prevailing. Oetjen V. Central Leather Co., 246 U.S. 297; Kennett v. Chambers, 14 How. 38 (1852). The united States treated with the Greets as an undivided body.

 2 Ind. Cl. Comm. 110.

 Treaty of Fort Jackson, Article 8, 7 Stat. 120 (1814).

 Finding 30, 2 Ind. Cl. Comm. 88.

 Ind. Cl. Comm. 105-107.

 Letter from Monroe to Baker, the British Charge d‘Affaires, July 10, 1815, Archives Record Group No. ’59, II Foreign Legations Notes:
“* * * as the Treaty -with the Creeks was concluded before the Treaty of Peace with Great Britain, the 9,th Article of that treaty has no bearing with that nation, * * *”
Letter from Adams to the American Ambassador to Spain, November 28, 1818, State Papers, IV Foreign Affairs 540 :
“This article had no application to the Creek Nation, with whom the united States had already made peace, by the treaty concluded on the 9th day of August, 1814, more than four months before the treaty of Ghent was signed.” Letter from Adams to the Spanish Minister, November 80, 1818, State Papers, IV Foreign Affairs 546 :
“[A British agent] was goading [the Creeks] the absurd pretence that the united States were bound by the Treaty of Ghent to give up to them the lands within the borders of the United States which had been ceded by the Creek Nation to the United States six months before the Treaty of Ghent was signed.”

 See the series of treaties ratified in 1815 with Indians engaged with the British during the War of 1812. 7 Stat. 130 to 144. A characteristic clause for these treaties read:
“The parties being desireous of re-establishing peace and friendship between the United States and their said tribe, and of being placed, in all things, and in every respect, upon the same footing upon which they stood before the late war between the United States and Great Britain, have agreed to the following articles: * * *” 7 Stat. 137. See Goebel, William Henry Harrison (1926) 206.

 Report of the Commissioners, October 18, 1816. State Papers II Indian Affairs 13.

 Sullivan v. Kidd, 254 U.S. 433, 442 (1921).